HOUSING RIGHTS CENTER; Karlene Henry; Thomas Brown; Daryle Williams; Dianne Wesley; Aubrey Franklin; Mary Young; Ed Nell; Jeffrey High; Marie Davis; Robin Steed; Dixie Martin; Sonio Lugo and Kandyce Jones; all individually and on behalf of the General Public, Plaintiffs,

v.

Donald STERLING; Donald Sterling Corporation; Donald Sterling Family Trust; and the Korean Land Company, L.L.C., Defendants.

No. CV 03–859DSF(EX).

United States District Court, C.D. California.

June 2, 2004.

---

Joanne Lichtman, Michael L. Turrill, Howrey Simon Arnold & White, Liam J. Garland, Neetu S. Badhan, Nisha Narendra Vyas, Los Angeles, CA, for Plaintiffs.

Adrianna M. Corrado, Michael T. Kennick, Michael W. King, King and Kennick, Huntington Beach, CA, Ileana M. Hernandez, Robert H. Platt, Sharon B. Bauman, Manatt Phelps and Phillips, Los Angeles, CA, Robert Phelps Baker, Baker and Associates, Glendale, CA, for Defendants.

Joanne E. Caruso, Howrey Simon Arnold and White, Los Angeles, CA.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

FISCHER, District Judge.

### I. PROCEDURAL HISTORY

This case arises out of allegations that Defendants racially discriminated against their tenants in violation of federal law. The Motion for Summary Judgment, or in the Alternative, for Partial Summary Judgment against Plaintiff Jeffrey High ("Motion"), Separate Statement of Uncontroverted Facts and Conclusions of Law

("SUF"), Declarations of Joanne Lichtman, Harley Choi and Brian J. Kramer and Request for Judicial Notice were filed April 23, 2004. The Opposition, Statement of Genuine Issues ("Response" and "Genuine Issues")[1], Declarations of Anny Kim, Dixie Martin and Jeffrey High, Submission of Documentary Evidence, and Appendix of Non–California Authorities were filed May 10, 2004. The Reply, Declarations of Craig Hubble and Robert H. Platt, Supplemental Declaration of Harley Choi and Objections to Evidence were filed May 17, 2004.

The Court heard oral argument on May 24, 2004. For the reasons discussed below, the Court DENIES the Motion for Summary Judgment.

### II. LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is *entitled to a judgment as a matter of law.*" FED. R. CIV. P. 56(c) (emphasis added). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Id.* If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, "spe-

---

1. The Court refers to High's responses to Defendants' SUF as "Response." Additional

facts in opposition to the Motion are referred to as "Genuine Issues."

cific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence and draws all inferences in the light most favorable to the nonmoving party. *T.W. Elec. Svc., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987). The evidence presented by the parties must be admissible. FED. R. CIV. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

### III. FACTUAL BACKGROUND

On February 1, 1997, Plaintiff Jeffrey High ("High") entered into a lease agreement with the Mark Wilshire Company, the prior owner of the apartment building located at 691 S. Irolo Street (the "Apartment Building"). SUF ¶ 1.[2] On April 30, 2002, Defendant Donald Sterling ("Sterling") purchased the Apartment Building from the Mark Wilshire Company; his related family trust, the Sterling Family Trust, took title to it. SUF ¶ 2. Under the terms of High's lease which became a month-to-month tenancy on or about January 30, 1998, High was required to make his rent payment on the first of every month. SUF ¶ 3. Under the terms of High's lease agreement, a late fee of $10.00 was to be charged for rent paid after the fifth of the month. Response ¶ 3.

During the course of his tenancy with Defendants, High frequently paid his rent later than that the fifth of the month. SUF ¶ 4; Response ¶ 4. During the five years he was a tenant at the Apartment Building, High had an informal arrangement with the Mark Wilshire Company, whereby he would pay his rent between the tenth and fifteenth of the month. Genuine Issues ¶ 15. As a formality, the Mark Wilshire Company had automatically generated three-day notices to tenants after the fifth of the month. *Id.* High continued to pay his rent on this same schedule for over five years without incident. *Id.*

After he assumed ownership of the Apartment Building in May 2002, Sterling told the manager of the Apartment Building, Dixie Martin ("Martin"), that he wanted to try an "experiment" intended to harass certain existing tenants to force them to move out. Genuine Issues ¶ 16. Accordingly, Sterling instructed Martin to refuse High's May 2002 rent. *Id.* His office would then file a small claims action, not an unlawful detainer action, against High for failure to pay rent. *Id.*

At a May 2002 meeting, Sterling told the Apartment Building staff that he "liked Korean tenants the best" and preferred to rent to them. Genuine Issues ¶ 17; Martin Dec. ¶ 4. Sterling made statements about other races, stating, "Hispanics just sit around all day watching television, smoking cigarettes and doing nothing else." *Id.*

On many other occasions, Sterling told Martin that he preferred Korean tenants because they "paid on time" and they were "good and they were clean and they didn't create any problems." Genuine Issues

2. The facts in the Order are taken from High's SUF, Defendants' Response and Defendants' Genuine Issues. The Court does not necessarily accept statements in the Response or Genuine Issues as true. Where such evidence is admissible, however, it is sufficient to raise a triable issue of fact. Where this Order includes evidence objected to by Defendants, those objections are overruled.

¶ 19. When Martin said she did not believe any certain race or ethnicity made a better tenant, Sterling repeatedly admonished her that many Koreans were "waiting in the wings" to take her job. *Id.*

Defendants sent tenants a notice dated May 4, 2002 ("Notice") stating that as of June 2002, reminders would be sent to tenants who had not paid their rent by the third of the month and that tenants who had not paid by the fifth would receive three-day notices and be subject to late fees. Genuine Issues ¶ 20. The Notice did not indicate that rent would be refused or that legal action would be filed. *Id.* The month Defendants assumed ownership of the Apartment Building, High paid his rent on May 15, 2002, as had been his usual practice for years. Response ¶ 4; *see also* High Dec. ¶ 5. His rent was returned to him the next day with no explanation. Genuine Issues ¶ 21.

On May 9, 2002, High was served with a 3–Day Notice to Pay Rent or Quit (the "3–Day Notice"). SUF ¶ 5. High contends the "universal protocol" for handling late rent payments had previously been the issuance of a three-day notice and then commencing an unlawful detainer proceeding if the rent were not paid during the three-day period following the notice. Response ¶ 7. In addition, such policies and protocol had allowed tenants a further opportunity to cure after the unlawful detainer proceeding had commenced. *Id.*

High failed to tender his rent within the three-day grace period provided under the 3–Day Notice. SUF ¶ 6. The 3–Day Notice did not indicate that tenants' rent would be refused as of May 2002. Response ¶ 6. High was given no opportunity to cure at any time, despite repeated attempts to pay his rent for months. *Id.*

Defendants did not request a late fee from High, but immediately served him with a small claims suit in West Los Angeles, which he had transferred to downtown Los Angeles. Response ¶ 7; Genuine Issues ¶ 23. The judge deferred the small claims case, pending the outcome of the unlawful detainer proceeding. Genuine Issues ¶ 39.

High attempted to pay his rent for June 2002 twice, the second time directly to Defendants by Federal Express. Genuine Issues ¶ 26. High also paid his rent for the month of July 2002, but it was returned to him. Genuine Issues ¶ 27. High paid his rent for July on June 10, 2002 because he was going to be out of town in July, but it was also returned. *Id.* High paid his rent for the month of August 2002, but it was returned to him. Genuine Issues ¶ 28. Defendants often returned High's rent by slipping it under his door late at night. Genuine Issues ¶ 29.

After High failed to make several timely rent payments within the three-day grace period under the Notice, Defendants initiated an unlawful detainer action in the Los Angeles County Superior Court on August 30, 2002 (Case No. 02U 15740) (the "UD Action"). SUF ¶ 7. Defendants continued to refuse High's attempts to pay rent in May, June, July and August. Response ¶ 7. The UD Action did not proceed to trial. Genuine Issues ¶ 40. No evidence was presented by either side. *Id.* High entered into a Stipulation for Judgment ("Stipulated Judgment") with Defendant Korean Land Company, L.L.C. SUF ¶ 8. High asserts he did so to avoid the alleged harassment and discrimination and the resulting emotional and physical distress. The Stipulated Judgment adjudged that High owed $6,570.48 in back rent and fees, and that if he "paid [that amount] by cashier's check on or before 11/1/02 . . . [Defendants would] cancel the lockout and [High could] remain at the premises. *Id.* If it were not paid, the lockout would proceed [on November 4, 2002]." *Id.*

High did not pay the stipulated amount. SUF ¶ 9; Response ¶ 9. Consequently, he was required to forfeit possession of his apartment by November 4, 2002. *Id.* High contends he voluntarily vacated his apartment in October 2002, Response ¶ 9, and never received a writ of possession. *Id.; see also* High Dec. ¶ 10. None of the Defendants has ever refused to rent High an apartment unit for any reason. SUF ¶ 10. Because Defendants were not the owners of the building when High initially rented his apartment in 1997, High has never signed a lease with Defendants. Response ¶ 10.

After Sterling purchased the Apartment Building, he terminated the doormen. SUF ¶ 11. On May 10, 2002, Defendants distributed a memo to the tenants indicating that new doormen would be posted at the Apartment Building. Genuine Issues ¶ 35. The security guards were posted at the front door and continued to open the door for tenants. Genuine Issues ¶ 36. High presented evidence that the doormen, now Korean–American security guards, would open the doors for Korean, but not non-Korean tenants. *See* Response ¶ 11. On one occasion when High's hands were full of grocery bags, the guard refused to acknowledge him or open the door. He had to put the bags down to get out his key and struggle through the door. *Id.* The doorman refused to help him or look at him. *Id.* Plaintiff Brown, also an African–American, was refused doorman service after the door was opened for a Korean tenant. *Id.*

After they purchased the Apartment Building, Defendants renamed it "Korean World Towers" and required that all rent payments be made to that name. Genuine Issues ¶ 30. High contends Defendants hung a banner written almost entirely in Korean that stated: "Apartments for Rent" and "Korean Managers." Genuine Issues ¶¶ 31–32. Defendants also pre-

pared and distributed notices to Apartment Building tenants, including High, that were written entirely in Korean. *Id.* High could not read or understand the contents of the notices. Genuine Issues ¶ 37.

High alleges he suffered emotional and physical distress as a result of defendants' discriminatory conduct, including insomnia and high blood pressure, for which he had to seek medical treatment. Genuine Issues ¶ 38. High also incurred moving expenses when he moved out of his apartment. Genuine Issues ¶ 42.

On January 29, 2004, Plaintiffs filed their second amended complaint ("SAC") alleging: (1) violations of the FHA; (2) violations of the California Fair Employment and Housing Act; (3) violations of the California Unruh Civil Rights Act; (4) unfair business practices; (5) negligence; (6) breach of the implied covenant for quiet enjoyment; (7) violations of the Civil Rights Act of 1866; and (8) violations of the Bane Civil Rights Act.

Defendants now ask the Court to adjudicate this case summarily in their favor, arguing: (1) the *Rooker–Feldman* doctrine bars High's FHA claims insofar as they are based on his eviction; (2) *res judicata* bars High from litigating whether his eviction proceedings were lawful; (3) High has failed to adduce evidence demonstrating that he has a cognizable claim under the FHA; and (4) High's remaining causes of action fail for the same reasons his FHA-based cause of action fails.

## IV. DISCUSSION

### A. *THE ROOKER–FELDMAN DOCTRINE DOES NOT PRECLUDE HIGH'S FHA CLAIMS BASED ON HIS EVICTION.*

Defendants argue that, to the extent High's claims are based on his eviction,

they require this Court to review and reverse the Stipulated Judgment entered in the UD Action in which High agreed to the payment of back rent—the non-payment of which would lead to the forfeiture of his apartment. According to Defendants, to determine whether High's current allegations of racial animus have merit would require this Court to review the previous state court judgment in violation of the *Rooker–Feldman* doctrine.

■ Under the *Rooker–Feldman* doctrine, a district court lacks "subject matter jurisdiction to hear a direct appeal from the final judgment of a state court." *Noel v. Hall,* 341 F.3d 1148, 1158 (9th Cir.2003). The Supreme Court "is the only federal court with jurisdiction to hear such an appeal." *Id.*

■ The *Rooker–Feldman* doctrine bars federal jurisdiction not only for direct appeals from state court decisions, but also for "de facto appeals," whereby "the plaintiff in federal district court complains of a legal wrong allegedly committed by the state court, and seeks relief from the judgment of that court." *Id.* at 1163; *see also Kougasian v. TMSL, Inc.,* 359 F.3d 1136, 1143 (9th Cir.2004) (no de facto appeal in violation of *Rooker–Feldman* where plaintiff "has asserted no legal error by the state court"). Accordingly, an affirmative independent legal wrong asserted against a party involved in the state court action in a subsequent federal action is not barred under *Rooker–Feldman. Noel,* 341 F.3d at 1164.

■ The *Rooker–Feldman* doctrine applies not only to attempts to raise issues that could have been raised in the previous state action, but also to efforts to raise any issue "inextricably intertwined" with the prior decision of the state court. *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 483 n. 16, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). To be "inextricably intertwined" with a state court judgment,

the federal claim must succeed "only to the extent that the state court wrongly decided the issues before it (or) if the relief requested ... would effectively reverse the state court decision or void its ruling." *Fielder v. Credit Accept. Corp.,* 188 F.3d at 1034. "The crucial point is whether the district court is being asked to review the state court decision." *Fayyumi v. City of Hickory Hills,* 18 F.Supp.2d 909, 913 (N.D.Ill.1998). For an issue to be inextricably intertwined with a state court claim, there must have been a reasonable opportunity to raise the issue in the state proceedings. *Long v. Shorebank Develop. Corp.,* 182 F.3d 548, 558 (7th Cir.1999); *Wood v. Orange County,* 715 F.2d 1543, 1547 (11th Cir.1983).

■ In the present case, High's federal claims do not constitute an appeal, de facto or otherwise, of the Stipulated Judgment entered in the UD Action; High is not seeking to set aside the state court judgment. *See Johnson v. DeGrandy,* 512 U.S. 997, 1005–06, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (*Rooker–Feldman* doctrine applies only when the federal plaintiff was a party to the state case and is challenging an adverse decision by the state court). In the Stipulated Judgment, High agreed to pay the back rent he owed Defendants. By contrast, in the present case, High alleges that he was injured solely by the discriminatory practices of Defendants. SAC ¶¶ 1, 11–15, 39–44. High is not seeking damages for any adverse effects of the Stipulated Judgment. *See Busch v. Torres,* 905 F.Supp. 766, 770 (C.D.Cal.1995) ("a suit seeking damages for the execution of a judicial order is just a way to contest the order itself, [therefore] the *Rooker–Feldman* doctrine is in play") (quoting *Homola v. McNamara,* 59 F.3d 647, 651 (7th Cir.1995)). He does not allege that the court in the UD Action committed error in entering the Stipulated Judgment. He is

not seeking reversal of that judgment, nor is he contending that entry of the judgment caused him any injury. SAC ¶¶ 39–44, 64. Rather, High expressly contends that he was not evicted, but decided to move out rather than continue to be subjected to Defendants' alleged discriminatory conduct. SUF ¶¶ 41, 43. The *Rooker–Feldman* doctrine does not apply where, as here, a plaintiff asserts an *independent* claim, even if it is inconsistent with a state court judgment in an earlier case to which he or she was a party. *Noel*, 341 F.3d at 1164.

In *Kougasian*, 359 F.3d at 1142, the Ninth Circuit noted that the *Rooker–Feldman* doctrine did not bar the plaintiff's federal causes of action, where, as in the present case, the plaintiff only cited "wrongful acts by the defendants" and did not allege legal error by the state court or seek damages based on any alleged legal error by the state court. The court noted that "[i]t is true that factual allegations and legal claims in these four causes of action are almost identical to the allegations and claims asserted in state court in *Kougasian I* and *II,* but that is not sufficient reason to find the causes of action barred by *Rooker–Feldman*." *Id.*

Indeed, in contrast to jurisdictions that have interpreted the *Rooker–Feldman* language more broadly, the Ninth Circuit has held that the " 'inextricably intertwined' test does not mean that a federal plaintiff can never raise issues that are 'inextricably intertwined' with issues already decided in completed state court litigation." *Id.* Rather, "inextricably intertwined" simply means a plaintiff cannot assert legal error of a state court judgment in a district court. *Id.* at 1142–43. Such is not the case where, as here, High seeks to prove allegations entirely separate from the previously litigated eviction proceedings and payment of back rent. Allegations that Defendants' actions led High to want to leave his apartment and sign the Stipulated Judgment do not challenge possession of the apartment or payment of back rent or otherwise seek reversal of the state court judgment.

The cases on which Defendants rely are inapposite. *Fayyumi*, 18 F.Supp.2d at 909, is unpersuasive. In *Fayyumi*, plaintiff-tenants, previously evicted in state court for nonpayment of rent, brought action against the owner of the apartment building, management corporation and corporate principals under, *inter alia,* § 3604(a) of the FHA, arguing that they had been evicted based on racial animus. 18 F.Supp.2d at 910–11. The district court held that the *Rooker–Feldman* doctrine barred plaintiffs' FHA § 3604(a) claim, because plaintiffs' FHA claims could not have existed but for the state court's judgment requiring plaintiffs' eviction; in other words, "the injury was only complete when the state court issued its ruling." *Id.* at 917. The state claim in *Fayyumi* thus involved possession of the apartment—i.e., in state court, the landlord had sought judgment for possession and damages that resulted in an eviction proceeding—and the subsequent federal case involved a claim for damages based on the state court decision. As previously mentioned, High is not seeking to reverse the Stipulated Judgment, nor is he seeking any monetary damages for its implementation. *Fayyumi* does not apply.

In *Busch*, 905 F.Supp. at 769, also relied on by Defendants, plaintiff-tenant filed a civil rights action against defendants, the county and deputy sheriff, alleging violations of her constitutional rights in the execution of a writ of possession issued by the state court in an unlawful detainer action. *Id.* ("The gravamen of plaintiff's complaint is a challenge to the state court judgment in the unlawful detainer action and the subsequent enforcement of the

judgment through the writ of possession."). The court held *Rooker–Feldman* applied because "a suit seeking damages for the execution of a judicial order is just a way to contest the order itself, [therefore] the *Rooker–Feldman* doctrine is in play." *Busch,* 905 F.Supp. at 770. High, however, makes no claim of wrongful eviction nor does he seek any damages for the execution of the writ of possession. Rather, High's claims are based on the alleged racially discriminatory treatment he endured while a tenant in Defendants' building. These claims are not inextricably intertwined with the state court judgment and are not barred by the *Rooker–Feldman* doctrine.

## B. RES JUDICATA DOES NOT BAR HIGH'S CLAIMS.

■ Where *Rooker–Feldman* does not bar a suit, the Court must look to state law to determine whether defendants nevertheless prevail under *res judicata. Noel,* 341 F.3d at 1164. Under *res judicata,* a final judgment on the merits of an action precludes the parties from relitigating issues that were or could have been raised in that action. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). *Res judicata* bars a federal action where an earlier lawsuit: (1) involved the same claim sued on in the present action; (2) involved the same parties or persons in privity of interest with them; and (3) resulted in a final judgment on the merits. *Nordhorn v. Ladish Co., Inc.,* 9 F.3d 1402, 1404 (9th Cir.1993) (citing *Blonder–Tongue Laboratories, Inc. v. University of Ill. Found.,* 402 U.S. 313, 323–24, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)).

■ As the first prong of the test indicates, *res judicata* bars later litigation only when the issues decided in the prior adjudication were identical to issues raised in the present action. *See, e.g., City of Martinez v. Texaco Trading & Transp. Inc.,*

353 F.3d 758, 762–63 (9th Cir.2003). Claims are identical if the two suits involve infringement of the same primary right. *Amaro v. Continental Can Co.,* 724 F.2d 747, 749 (9th Cir.1984). To determine whether both actions involve the same right, courts "look to the rights sought to be vindicated and, specifically, to the claimed harm." *City of Martinez,* 353 F.3d at 762.

Defendants here argue that the UD Action and the instant action arise out of the same transactional nucleus of operative facts, namely High's eviction from the Apartment Building. According to Defendants, the final adjudication of the Stipulated Judgment in the UD Action, which determined that High no longer had a legal right to possession of his apartment if he did not pay back rent, would be impaired if High is allowed to pursue his current FHA claim. Defendants argue both suits involve the same rights—the landlord's right to timely payment of rent from High, High's right to possession of his apartment and the landlord's right to evict High for nonpayment of rent. Moreover, substantially the same evidence would be presented in the two actions, including whether High failed timely to pay his rent and whether his eviction was legal. Based on the foregoing, Defendants argue, by failing to raise his FHA claims in the UD Action, High has waived them and cannot be allowed to litigate them now.

■ This Court disagrees. As an initial matter, findings in unlawful detainer actions "should in general be afforded limited *res judicata* effect because of the special nature of such proceedings." *Vargas v. Municipal Court for the Riverside Judicial Dist.,* 22 Cal.3d 902, 916, 150 Cal.Rptr. 918, 587 P.2d 714 (1978). The summary nature of an unlawful detainer action, which focuses on immediate possession of

a property, means "a judgment in unlawful detainer usually has very limited *res judicata* effect and will not prevent one who is dispossessed from bringing a subsequent action to resolve questions of title or to adjudicate other legal and equitable claims between the parties." *Vella v. Hudgins,* 20 Cal.3d 251, 255, 142 Cal.Rptr. 414, 572 P.2d 28 (1977).

In *Vella,* the plaintiff filed an action for injunctive relief and constructive trust based on fraud and defendant initiated an unlawful detainer action to evict plaintiff from the property at issue. *Id.* at 253, 142 Cal.Rptr. 414, 572 P.2d 28. In the unlawful detainer action, plaintiff asserted an affirmative defense of fraud. *Id.* at 254, 142 Cal.Rptr. 414, 572 P.2d 28. In a subsequent action, the court rejected defendants' *res judicata* argument that would have barred plaintiff from bringing the same allegations of fraud, finding the unlawful detainer action had not allowed the plaintiff a full adversary hearing on her fraud claim. *Id.* at 257, 142 Cal.Rptr. 414, 572 P.2d 28. In making its finding, the court recognized the trade-off in terms of *res judicata* effect that bringing an unlawful detainer action involves: "In return for speedy determination of his right to possession, plaintiff sacrifices the comprehensive finality that characterizes judgments in nonsummary actions." *Id.* at 258, 142 Cal.Rptr. 414, 572 P.2d 28; *see also Kane v. Oak Trust & Sav. Bank,* 1995 WL 683820, *4, 1995 U.S. Dist. LEXIS 17120, *12 (N.D.Ill. Nov. 15, 1995) (defendants who did not assert a defense of discrimination in an unlawful detainer action were not barred by *res judicata* from raising it in a later proceeding because they "had no reason to litigate issues of housing discrimination, retaliatory eviction, and intentional infliction of emotional distress where the only thing at stake was possession of an apartment they had already decided they no longer wanted").

■ In light of the foregoing, the UD Action and the present action do not involve the same claims. As mentioned previously, the Stipulated Judgment determined Defendants' right to repossess the apartment if High failed to pay back rent. By contrast, the present FHA claims are premised on Defendants' alleged discriminatory acts toward High during his tenancy in the Apartment Building. In the current action, High does not contest possession. Moreover, in the unlawful detainer action, High did not raise the issue of the discrimination he allegedly endured while a tenant.

Defendants also claim that the two suits arise out of the same facts because "substantially the same evidence would be presented in the two actions, including High's failure to timely pay rent, his default under the Stipulated Judgment and the legality of High's eviction." Motion at 10. However, no evidence was presented in the UD Action because it ended in a Stipulated Judgment before trial. Genuine Issues ¶ 40. The Stipulated Judgment contains no evidence about the issues relevant to the present case: High's attempts to pay his rent, Sterling's plan to try to force him out by refusing his rent then suing him for it or Defendants' statements, notices and banners indicating a preference for Korean tenants.

The claims in the present case are not the same as those in the previously litigated UD Action. High's suit is not barred by *res judicata.*

## C. FHA CLAIMS

Title VII discrimination analysis applies to Fair Housing Act discrimination claims, permitting a plaintiff to establish an FHA discrimination claim where he or she can demonstrate disparate treatment or disparate impact. *Harris v. Itzhaki,* 183 F.3d 1043, 1051–52 (9th Cir.1999) (citing *Gam-*

*ble v. City of Escondido,* 104 F.3d 300, 304–05 (9th Cir.1997)).

To bring a claim for disparate treatment or disparate impact, the plaintiff must establish a prima facie case by showing: "(1) plaintiff's rights are protected under the FHA; and (2) as a result of the defendant's discriminatory conduct, plaintiff has suffered a distinct and palpable injury." *Id.* (citing *Lowe v. City of Monrovia,* 775 F.2d 998, 1006 (9th Cir.1985)). Once a plaintiff establishes this prima facie case, he or she has the presumption of discrimination. *Id.* The Court may not consider rebuttal evidence at this stage. *Id.*

After this prima facie showing is made, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the action. *Id.* (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). This showing only requires the defendant to set forth a legally sufficient explanation. *Id.* (citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

"Once a prima facie case is established . . . summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a [discrimination claim] is the elusive factual question of intentional discrimination." *Id.* (quoting *Lowe,* 775 F.2d at 1009).

### 1. *Section 3604(a)*

Section 3604(a) of the FHA makes it unlawful to "refuse to sell or rent . . . or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a).

While § 3604(a) claims often implicate individuals who make apartments unavailable in a literal sense (for example, by refusing to rent to certain races, or, more subtly, by racial steering), § 3604(a) also prohibits actions that make apartments *effectively* unavailable. Thus, for example, Department of Housing and Urban Development ("HUD") regulations specify miscellaneous practices covered by § 3604(a) that, while not explicit denials of housing, otherwise make unavailable or deny housing to persons protected by Title VII. These prohibited practices include, *inter alia:* refusing to provide property or hazard insurance for dwellings or providing insurance differently because of race; taking adverse action against an employee, broker, or agent because that person has refused to participate in a discriminatory housing practice; refusing to deal with certain brokers or agents because they or their clients are of a particular protected class; employing codes or other devices to segregate or reject applicants, purchasers, or renters because of race prohibited grounds; refusing to show listings of dwellings in certain areas because of prohibited grounds; and hindering the processing of an application made by a purchaser or renter or refusing to approve such a person for occupancy in a cooperative or condominium dwelling because of race or other prohibited grounds. ROBERT G. SCHWEMM, *HOUSING DISCRIMINATION LAW & LIT.* § 13:16 (West 2003).

■ As these HUD regulations suggest, the FHA should be "interpreted broadly to effectuate its purposes." *Hous. Rights Ctr. v. Donald Sterling Corp.,* 274 F.Supp.2d 1129, 1137 (C.D.Cal.2003). While " § 3604(a) does not reach every event that might conceivably affect the availability of housing," it "is designed to ensure that no one is denied the right to live where they choose for discriminatory reasons." *Jersey Heights Neighborhood Ass'n v. Glendening,* 174 F.3d 180, 192 (4th Cir.1999); *The Smart Unique Ser-*

*vices Corp. v. Mortgage Correspondence,* 1994 WL 274962, \*2, 1994 U.S. Dist. LEXIS 8230, \*5 (N.D.Ill.1994) (to succeed under § 3604(a), "plaintiffs must allege that by discriminating against them, the defendants have affected their ability to procure housing").

 High argues that Defendants engaged in a variety of discriminatory practices during his tenancy that effectively made his apartment "unavailable" to him within the meaning of § 3604(a). In support of this contention, High alleges: (1) Defendants deviated from the previous owner's policies for addressing the failure to pay rent when they dealt with High—for example, by initiating a small claims action against High instead of giving him an opportunity to cure when he did not pay his rent during the three-day grace period after receiving the 3–Day Notice, Response ¶ 7; and (2) Defendants refused and returned his rent for four months, initiating an unlawful detainer action under a false pretext while the small claims action was still pending against him for the same rent. *Id.* ¶ 10. High further alleges that during the months that High's rent was being refused: (1) Defendants changed the name of the Apartment Building to "Korean World Towers," Genuine Issues ¶ 30; (2) Defendants hung at least one banner written almost entirely in Korean from the building advertising apartments, *id.* ¶¶ 31–32; (3) High was treated differently by building personnel, *id.* ¶¶ 33–36; (4) High received building notices written solely in Korean, *id.* ¶ 37; (5) High was informed by building staff that Sterling had stated he preferred to rent to Korean tenants, *id.* ¶ 18; (6) Sterling frequently stated his preference for Korean tenants to Martin, *id.* ¶¶ 16–17, 10; and (7) Sterling instructed Martin to refuse High's rent as part of an experiment to harass him. *Id.* ¶ 16.

The Court finds these factual allegations sufficient to raise a triable issue as to whether Defendants made the apartment unavailable to High based on racially discriminatory motives in violation of § 3604(a). By its express language, § 3604(a) prohibits discriminatory conduct that negatively impacts a plaintiff's ability to secure housing. To survive summary judgment on a § 3604(a) cause of action, High must demonstrate disparate impact—i.e., that High was treated differently from tenants of other races with respect to the availability of apartments under Defendants' management.

Arguably, Defendants' alleged actions evinced a preference for Korean tenants that created a hostile environment and effectively made High's apartment unavailable to him. More specifically, High alleges Defendants concocted a scheme to force him to move out by refusing to cash his rent checks and then brought the UD Action and small claims matter under the pretext of nonpayment of rent. Moreover, High's other claims, including Defendants' racially-biased comments, hiring of Korean security guards, changing the name of the Apartment Building, advertising building vacancies or posting of notices in Korean, all suggest a preference for Korean tenants and disparate treatment of non-Korean tenants so as to substantiate High's § 3604(a) claim. Construing the factual allegations in the light most favorable to the non-moving party and considering "the elusive factual question of intentional discrimination," *Harris,* 183 F.3d at 1051, High has raised a triable issue as to whether he suffered racially disparate treatment at the hands of Defendants that made his apartment effectively unavailable to him.

In *Harris,* 183 F.3d at 1043, a case similar to the present action, the court found a tenant had a triable § 3604(a)

claim where an agent of the landlord stated the landlord's preference for renting apartments to certain races and where a tenant was subject to eviction notice procedures that deviated from the landlord's ordinary practice after complaining of racial discrimination.

As in *Harris*, the Court here cannot hold as a matter of law that the variety of ways in which Defendants catered to Korean tenants, coupled with Defendants' discriminatory statements, taken as a whole, did not create a hostile environment sufficient to make High's apartment effectively unavailable to him. Moreover, considering the aura of racial animus thus created, the Court, as in *Harris*, may infer that Defendants' decision to bring the unlawful detainer action and small claims action may have been pretextual in further violation of § 3604(a). Regardless, these issues are factual ones to be determined by the trier of fact at trial and not by this Court on a motion for summary judgment. High has established a prima facie case sufficient to survive summary judgment; he has raised a triable issue as to whether he was treated differently than other tenants based on his race with respect to the availability of apartments in violation of § 3604(a).

2. *Section 3604(b)*

■ Section 3604(b) of the FHA makes it unlawful "[t]o discriminate against any person in terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin." 42 U.S.C. § 3604(b). To state a claim under § 3604(b), a plaintiff must show that he or she was subjected to different "terms, conditions, or privileges because of a protected status." *Inland Mediation Board v. City of Pomona*, 158 F.Supp.2d 1120, 1148 (C.D.Cal.2001). The FHA thus not only demands that tenants be able to secure an apartment on a nondiscriminatory basis,

but also "guarantees their right to equal treatment once they have become residents of that housing." *Id.* As with a § 3604(a) claim, to survive a summary judgment motion on a § 3604(b) claim, a plaintiff must provide proof that he or she suffered "disparate treatment" in that "defendant intentionally discriminated against plaintiff." *Honce v. Vigil*, 1 F.3d 1085, 1088 (10th Cir.1993).

■ Generally, this provision has been construed to prohibit landlords from "demanding higher rents, prices, or more stringent terms from minority applicants than are required of other prospects." SCHWEMM § 14:2. Thus, § 3604(b) claims have been sustained for actions such as monitoring conduct of Hispanic tenants and making derogatory remarks toward Hispanics, *United States v. Sea Winds of Marco, Inc.*, 893 F.Supp. 1051, 1055 (M.D.Fla.1995), restricting families with children from using a building's swimming pool or laundry facility, *Fair Housing Congress v. Weber*, 993 F.Supp. 1286, 1292–93 (C.D.Cal.1997), or providing disparate "rental charges, security deposits and the terms of lease" based on tenants' race, color or national origin. 24 C.F.R. § 100.65(b)(1).

■ Based on the foregoing, High has presented sufficient evidence to suggest he may have been subjected to less favorable "terms, conditions or privileges" with respect to the apartment or the eviction proceedings brought against him than other tenants based on his race. In support of his § 3604(b) claim, High reiterates the allegations he made in support of his § 3604(a) claim. According to High, all of the aforementioned events created a hostile environment that, in turn, subjected him to different terms, conditions and privileges from Korean tenants of the Apartment Building. After living in the building for years, establishing friends and employ-

ment in the community, High suffered such severe emotional distress due to Defendants' conduct, he felt he had no choice but to move out. Genuine Issues ¶¶ 8, 38, 41, 43. Insofar as Defendants evinced a preference for Korean tenants by stating so, *id.* ¶¶ 10, 16–18, changing the name of the Apartment Building to include the word "Korean," *id.* ¶ 30, providing biassed treatment by building personnel, *id.* ¶¶ 33–36, distributing notices written in Korean, *id.* ¶ 37, hanging a banner written in Korean, *id.* ¶¶ 31–32, and deviating from historical housing practices with respect to the acceptance of rent checks and pursuit of back rent, *id.* ¶ 10, High has raised a triable issue under § 3604(b).

3. *Section 3604(c)*

■■■■■. Section 3604(c) makes it unlawful:

> [t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, sex, handicap, familial status, or national origin.

HUD has interpreted § 3604(c) to "apply to all written or oral notices or statements by a person engaged in the sale or rental of a dwelling." 24 C.F.R. § 100.75(b). In prohibiting advertisements, statements, or other notices which indicate a discriminatory preference in the context of the selling or renting of a dwelling, § 3604(c) does not require evidence of discriminatory intent. *Fair Hous. Congress v. Weber*, 993 F.Supp. 1286, 1290 (C.D.Cal.1997). An oral or written statement violates § 3604(c) if it suggests a preference, limitation or discrimination to the "ordinary listener" or reader. *United States v. Hunter*, 459 F.2d 205, 215 (4th Cir.1972); *see also Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir.1991) ("we read the statute to be violated if an ad for housing

suggests to an ordinary reader that a particular race is preferred or dispreferred for the housing in question").

■■■■ Contrary to Defendants' assertions, § 3604(c) protects not only prospective tenants, but also existing ones. *Housing Rights Center*, 274 F.Supp.2d at 1142 ("Certainly a discriminatory statement ... violates § 3604(c), even if not made at the moment of first sale or rental."). Moreover, to bring a § 3604(c) claim, a plaintiff need not have been the direct victim of the discriminatory statements perpetuated by defendants. In *Harris*, for example, the Ninth Circuit held that an African–American tenant who overheard a landlord's agent say "the owners don't want to rent to Blacks" had stated a claim for violation of § 3604(c). 183 F.3d at 1052. The Court concluded that the tenant had "asserted a prima facie case of discrimination under the FHA—that [the manager's] discriminatory statement caused [the plaintiff] emotional distress and disruption in the quiet enjoyment of her apartment." *Id.; see also HUD v. Gutleben*, 1994 WL 441981, *15 (H.U.D.A.L.J. Aug. 15, 1994); *HUD v. Williams*, 1991 WL 442796, *23 (H.U.D.A.L.J. March 22, 1991).

■■■■ In the present case, High has similarly met his burden and survived summary judgment under § 3604(c). High has presented sufficient evidence that notices written in Korean were circulated in the Apartment Building. The publication of notices and banners written only in Korean would suggest to the ordinary reader a racial preference for Korean tenants. In addition, the contents of the banner, including the phrase "Korean Managers," written in Korean raises a triable issue as to whether Defendants preferred Korean tenants. That High did not speak Korean or could not read the contents of these banners is irrelevant, as § 3604(c) requires only that the notices or state-

ments in question suggest a preference for a particular group to an "ordinary reader"—not that they suggest a preference to a tenant or even to the plaintiff.

Moreover, Sterling's statements that he preferred to rent to Korean tenants even more explicitly suggests to an ordinary listener a preference for Korean tenants in violation of § 3604(c). These include both the statements Sterling allegedly made to staff at a meeting and individual statements to Martin. High has raised a triable issue as to his § 3604(c) cause of action.

### D. *HIGH'S OTHER CAUSES OF ACTION SURVIVE*

Defendants argue that High's seven other causes of action are premised on the underlying assumption that High suffered the same types of housing discrimination that supposedly give rise to his FHA-based claim. SAC ¶ 65–77.

To be successful on a motion for summary judgment, the moving party must show that there is no material factual dispute as to each cause of action challenged. *See Emery v. Merrimack Valley Wood Products, Inc.*, 701 F.2d 985, 991 (1st Cir. 1983) (party moving for summary judgment has "the burden of affirmatively showing that there is no genuine issue of fact as to every relevant issue raised by the pleadings").

High's state law claims preclude a much broader range of conduct than his claims under the FHA such that the outcome of the FHA claim is not determinative of the other claims. For example, the California Fair Employment and Housing Act ("FEHA") provides a greater level of protection and rights for persons aggrieved by discriminatory housing practices than does the FHA. *See, e.g.,* Cal. Gov't Code §§ 12955(a) ("It shall be unlawful for the owner of any housing accommodation to discriminate against or harass any person

because of the race, color, religion, sex, sexual orientation, marital status, national origin, ancestry, familial status, source of income, or disability of that person").

Similarly, the Unruh Act prohibits all forms of arbitrary discrimination in the operation of business establishments. *See* Cal. Civ.Code § 51(b) ("All persons within the jurisdiction of this state are free and equal, and ... are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever").

 High's claim for unlawful and unfair business practices claim under Cal. Bus. Prof.Code § 17200 is also much broader than his FHA claims. In fact, the term "unfair" under § 17200 allows an action to be deemed "unfair" under the statute even if it is lawful. *See Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). Defendants' alleged actions, even if lawful under the FHA (which they are not), are actionable under § 17200. High raises triable issues of fact with regard to the seven other causes of action.

### V. CONCLUSION

For the reasons stated above, summary judgment is DENIED.

IT IS SO ORDERED.