# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| WASHINGTON STATE HUMAN RIGHTS COMMISSION, presenting the case in support of the complaint filed by SUNSHINE LEON ANDREW HARMON, LANA CHANEY-HARMON, and AIDAN CHANEY-DRINARD, | No. 57010-6-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| BENJAMIN A. THOMAS, JR., LINDA FERRIS, and the BENJAMIN A. THOMAS, SR. CREDIT SHELTER TESTAMENTARY TRUST, | |
| Appellants. | |

CHE, J.—In 2014, Sunny Hamon and his wife, Lana Chaney-Harmon, purchased property from Benjamin A. Thomas, Sr. Credit Shelter Testamentary Trust (Trust) through Benjamin Thomas. Shortly after moving onto their property, the Harmons began receiving letters from Thomas and his attorney alleging that the Harmons were non-compliant with the covenants, conditions, & restrictions (CC&Rs) attached to their property.

In 2016, Thomas brought suit against the Harmons to enforce the CC&Rs. Thomas succeeded, securing injunctive relief against the Harmons. The Harmons filed a complaint with the Human Rights Commission (HRC) alleging discrimination. Subsequently, HRC brought a discrimination complaint against Thomas. The administrative law judge (ALJ) determined, in its Final Order, that Thomas had not discriminated against or harassed the Harmons. HRC appealed. On appeal, the superior court set aside the Final Order as being unsupported by substantial evidence and as arbitrary and capricious. Thomas appeals, arguing that the superior court erred in setting aside the Final Order.

We hold that (1) HRC's claim is not barred by res judicata; (2) the ALJ erred in interpreting and applying RCW 49.60.222(1)(g); (3) the ALJ did not err in interpreting and applying RCW 49.60.222(1)(b); (4) the ALJ did not err in interpreting and applying RCW 49.60.2235; (5) the ALJ's witness' credibility findings are not arbitrary, capricious, and unsupported by substantial evidence; and (6) the ALJ did not commit legal error in determining witness credibility. Consequently, we affirm in part and reverse in part, and remand for further action consistent with this opinion.

FACTS

Benjamin Thomas and his sister, Linda Ferris, develop and sell real estate through their family Trust. Thomas cleared and subdivided land for a housing development in Woodland, Washington. In September 2014, Sunny Harmon and his wife, Lana Chaney-Harmon purchased property from the Trust through Thomas. The Harmons are an interracial couple. Sunny

2

Harmon is "white and Creole."[1] Admin. Rec. (AR) at 185. Lana Chaney-Harmon is "white."

AR at 184. The couple have two children.

Prior to purchasing the property, the Harmons met Thomas and his realtor, Mary Meeker,

on the property several times. The Harmons viewed the property and described Thomas as being

"helpful with ideas" about where the Harmons should place their road and their home. AR at 57.

The Harmons drove their truck with their business logo to their meetings with Thomas. Meeker

provided the Harmons with a copy of the CC&Rs that attached to the property. After reviewing

the CC&Rs, the parties discussed the Harmons' work vehicles and whether they violated the

CC&Rs. The parties also discussed the construction of a pole barn as a way to house the

Harmons' work vehicles.

After Thomas agreed to two sale extensions, the Harmons closed on their property on

September 30, 2014. The Harmons took possession of the property several days before closing.

The Harmons' executed deed included a set of CC&Rs, regulating the property's use. The

CC&Rs included the following provisions:

> 3. Permitted Use: Except as otherwise provided herein, no parcel or lot shall be used for any purpose other than the construction of a single-family dwelling; except that barns, garages, and recreational vehicle storage buildings shall be allowed provided that any outbuildings shall be constructed in a permanent fashion and shall be completed in compliance of the applicable governmental authority including necessary permits and in specifications. Any outbuilding construction shall be completed within one (1) year of the start of construction. All outbuildings must compliment (i.e. be similar to) the house style in material, color and design, which shall include siding and roofing materials.

---

[1] Thomas did not initially know Harmon's ethnicity but thought that he was Middle Eastern. Thomas learned about Harmon's ethnicity while working together cutting timber after the Harmons purchased the property. Thomas asked Harmon what his ethnicity was, Harmon replied "Creole," and the two continued working. AR at 442.

4.  Pet Restriction. There shall be no Pit Bulls, Pit Bull crossbreeds, wolves or wolf crossbreeds allowed on any lot.

. . . .

6.  Temporary Structures: Mobile homes, modular homes or factory built homes of any kind shall not be allowed. No shacks, garages, barns or other out buildings of structures of a temporary character shall be used on any lot or parcel at any time. All structures must be built on a permanent foundation. Motorhomes or Recreational Vehicles may be used for limited family uses for periods not to exceed ten (10) days.

7.  Home Businesses: There shall be no commercial business or occupations allowed that require operation of equipment, on-site storage, or display of materials or inventory either outside or visible from any lot, or frequent deliveries of supplies or materials to the premises. Any allowable home businesses shall occur exclusively within a structure on the lot and shall not have any impact on the quiet enjoyment of any other lot.

8.  Commencement of Construction: The purchaser of a lot, their successor, assigns, or heirs, shall be required to complete construction of a residential structure on the lot within two (2) years of the date of commencement of construction. Owners may live in a motorhome or trailer during the construction of a residence for up to six months.

. . . .

13. Enforcement: The Grantor and/or a majority of owners of the lots within the Benefitted Tracts shall be entitled to bring any suit or action to enforce these Covenants. Should any suit or action instituted by the Grantor or a majority of the owners to enforce any of said reservations, conditions, agreements, covenants and restrictions, or to restrain the violation of any thereof, after demand for compliance therewith or for the cessation of such violation, and failure to comply with such demand, then and in either of said events and whether such suit or action be reduced to decree or not, the parties instituting such suit or action shall be entitled to recover attorney's fees in such suit or action, in addition to statutory costs and disbursements.

AR at 1667-70.

Shortly after closing, the Harmons took steps to prepare their property for construction.

The Harmons applied for a temporary power permit, laid conduit, and ran power and internet

lines. The Harmons lived on their property in a trailer while their home was being built. Within weeks of purchasing the property, the Harmons received their first compliance letter from Thomas and his attorney.

## I. COMPLIANCE LETTERS

On October 27, 2014, Thomas sent the first of four letters to the Harmons about compliance with the CC&Rs. Thomas told the Harmons to disregard the first letter before they had even received it. Meeker explained that the letter was sent at the request of another trust beneficiary that was "just trying to cause trouble for [Thomas]." AR at 75. Thomas did not send any other neighbor a compliance letter within a month of their moving onto the property.

The first letter alleged that the Harmons were in violation of CC&R provisions 6,7, and 8. The letter explained that:

> Motorhomes or Recreational Vehicles may be used for limited family use for periods not to exceed 10 days. Without a completed residence on the property this use is not allowed.

> No commercial businesses or occupations are allowed where there is operation, storage or display of business materials that is outside or visible from any lot. Parking of multiple business trucks and equipment is not allowed.

> Owners may live in a motorhome or trailer during construction of a residence for up to 6 months, as there are no active permits for construction or applications on file for construction this is not an allowed use.

AR at 2127.

The Harmons responded with a letter detailing their work on the property and explaining that they had applied for construction permits. The Harmons addressed the violations alleged in the first letter and agreed to "contain any work related material." AR at 2125. The Harmons acknowledge that they "would not have even purchased this lot if it was not for Mr. Ben

5

Thomas." AR at 2124. The Harmons describe Thomas as having been a "great source of help" and someone the Harmons greatly appreciated.[2] AR at 2124. At this point, the Harmons were "excited" to have Thomas as a neighbor. AR at 74.

On October 7, 2015, nearly a year after the first letter, the Harmons received a subsequent letter from Thomas' attorney. The letter alleged that the Harmons had "been living in a trailer . . . for longer tha[n] the six months allowed by the Covenants." AR at 2119. The Harmons admit they had been "living in the trailer for longer than six months" at this point because the building process was taking a long time. AR at 78. The letter further alleged that the Harmons had "constructed numerous temporary structures and placed a drop box on the property for a long period of time." AR at 2119. Furthermore, the letter explained that there had been reports of the Harmons driving too fast and that while "the covenants do not address this," Washington statutes do. AR at 2119. The letter demanded compliance and warned that noncompliance could lead to litigation.

On December 7, 2015, June Jones, Thomas' realtor, sent an email to Thomas' attorney stating:

> Tom is back from Arizona and ready to hunt people here in Washington—especially the Chaney Harmons and their lack of cooperation with the Covenants. He's loaded and ready for you to proceed as you advise necessary to get them to comply.

AR at 2114. Jones explained that she wrote the email "because Mr. Thomas had been . . . on a hunting trip and had been away." AR at 712. Jones acknowledged that the email was "[n]ot very funny in retrospect." AR at 712.

---

[2] The Harmons explained that Thomas helped remove a fallen tree from the Harmons land after severe weather.

Subsequently, on December 14, 2015, Thomas' attorney sent a letter to the Harmons. The letter described the Harmons as having violated CC&R provisions 6 and 8 by living in their trailer for longer than six months, constructing numerous temporary structures, and placing a storage container on their property for an extended period of time. The letter explained that although the CC&Rs allow "owners to live in a motorhome or trailer for up to six months while a residence is being constructed, even if a residence is being constructed, [the Harmons] have been living in a trailer for longer than the Covenants allow." AR at 1464. The letter further explained that "motorhomes and recreational vehicles may only be on the premises for no longer than a period of ten days." AR at 1464.

On December 18, 2015, Thomas' attorney sent the Harmons a final letter demanding compliance with the CC&Rs. The letter explained that the Harmons had not complied with the previous letters and that the violations were still continuing. Specifically, the letter stated that there had "been a trailer on [the Harmons'] property for quite some time, initially used as a temporary residence, and now being utilized for storage purposes." AR at 2231. Furthermore, the Harmons had "erected numerous temporary structures on the property." AR at 2231. The letter characterized both of these acts as violating CC&R provision 6. The letter noted that there appeared "to be multiple vehicles (trailers and trucks) on [the Harmons'] property bearing signs and logos of a business." AR at 2232. The letter cautioned that "Paragraph 7 of the Covenants specifically prohibits commercial business or occupations on the property that require operation of equipment, on-site storage, or *display materials* or inventory either outside or visible from any lot." AR at 2232. The letter further described acts not specifically addressed by the CC&Rs,

including, an excavated ditch along the Harmons' property line and the placement of poles around the property, without having obtained a permit to do so.

On December 31, 2015, the Harmons sent a letter responding to Thomas' attorney. The Harmons explained that they had removed the storage container from their property. The Harmons denied digging a ditch around their property and explained that they "merely removed sod." AR at 1466. The Harmons further explained there "are NO trailers bearing signs or logos of a business," and that there "is no on-site storage, or display of materials or inventory outside or visible from any lot." AR at 1466. Furthermore, the Harmons notified Thomas' attorney that he "need[ed] to clarify these said temporary structures in question." AR at 1466.

## II. 2016 CC&R ENFORCEMENT ACTION

In February 2016, Thomas brought suit to enforce the CC&Rs against the Harmons. AR at 92. Thomas sought injunctive relief. Initially, the Harmons did not have an attorney and filed their first response pro se. The Harmons "eventually hired an attorney" and filed several counterclaims. AR at 109. The Harmons' counterclaims included claims that Thomas "caused [the Harmons] severe mental, emotional and physical distress, anguish, anxiety and illness." AR at 1685. The Harmons sought general damages totaling $10,000.

The Harmons did not bring a counterclaim under the Washington Law Against Discrimination (WLAD). The Harmons explained that they did not know they could bring a discrimination claim. Furthermore, the Human Rights Commission's (HRC) investigation had just started and the Harmons "didn't want to really make claims on what were at [that] point suspicions." AR at 169. The Harmons voluntarily dismissed their counterclaims with prejudice.

8

The court ordered the Harmons to bring their pole barn[3] into compliance with the CC&Rs, cease from placing any more temporary structures on the property, and pay Thomas' attorney fees. The Harmons appealed the order. The appeal was ongoing at the time of the administrative hearing but has since been resolved.[4] *Thomas v. Harmon*, No. 52486-4-II (Wash. Ct. App. Apr. 21, 2020) (unpublished).[5]

### III. HUMAN RIGHTS COMMISSION INVESTIGATION AND COMPLAINT

In March 2016, the Harmons filed a questionnaire with HRC describing their experiences with Thomas. HRC initiated an investigation and filed a complaint on behalf of the Harmons. HRC brought the complaint under the WLAD in order to correct "unlawful and discriminatory" practices, and "to provide appropriate relief to" the Harmons. AR at 1602. HRC alleged (1) unwelcome conduct based on racial harassment in violation of RCW 49.60.222(1)(b), (2) discriminatory and unequal treatment in violation of RCW 49.60.222(1)(b), (3) retaliation in

---

[3] The CC&Rs do not allow for the construction of "pole barns with the metal siding and metal roofs." AR at 452. Although, Thomas alleged that the Harmons' pole barn was non-compliant with the CC&Rs, it is not clear in what state of completion the barn was in at the time of the litigation. Thomas could not initially remember if siding had been added but believed that the barn's roofing was complete. Thomas subsequently clarified that there "might have been a piece or two [of siding] up." AR at 413. The Harmons allege that at the time of litigation, the pole barn had no siding.

[4] This court declined "to address the trial court's order granting partial summary judgment regarding violation of the outbuildings covenant." *Thomas* v. *Harmon*, No. 52486-4-II, at 2 (Wash. Ct. App. Apr. 21, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2052486-4-II%20Unpublished%20Opinion.pdf. Furthermore, this court affirmed "the trial court's entry of the permanent injunction regarding temporary structures," but reversed "the trial court's award of attorney fees to the Trust regarding enforcement of the outbuildings covenant." *Id.* This court did affirm attorney fees to the Trust for "enforcement of the temporary structures covenant." *Id.*

[5] https://www.courts.wa.gov/opinions/pdf/D2%2052486-4-II%20Unpublished%20Opinion.pdf.

violation of RCW 49.60.2235, (4) discriminatory statements in violation of RCW 49.60.222(1)(g), and (5) aiding and abetting in violation of RCW 49.60.220. The complaint sought (1) damages for the Harmons; (2) a civil penalty of $10,000 as provided by RCW 49.60.225; (3) Thomas' completion of fair housing training; (4) an order enjoining Thomas from discrimination, retaliation, and/or harassment of persons based on protected classes; and (5) other equitable relief the tribunal thought necessary. Thomas raised the affirmative defense of res judicata, among others.

IV. ADMINISTRATIVE PROCEEDING

The administrative record is extensive and the facts are heavily contested. Because much of the dispute centers on several distinct instances of conduct, the following sections set forth facts focused on: (1) CC&R violations and enforcement and (2) disparaging remarks.

A.  *CC&R Violations and Enforcement*

The parties do not dispute that Thomas enforced the CC&Rs against the Harmons and their neighbors, specifically George Trice, Jacob Armstrong, and Rebecka and Kevin Hinkle. The violations can be organized into three categories: (1) temporary structures, (2) motorhomes and recreational vehicles, and (3) home businesses and work vehicles.

1.  *Temporary Structures*

The CC&Rs do not define "temporary structure." During the administrative hearing, Thomas explained that he understood the term as meaning "[s]omething that is not fastened down . . . . Something that can be moved is a temporary structure." AR at 396. The Harmons, Hinkles, Armstrongs, and George Trice placed temporary structures on their properties.

10

George Trice placed a Conex storage container on his property. Thomas spoke to Trice about removing the container. Trice "indicate[d] an intent to comply with the CC&Rs" and Thomas worked with Trice for a couple months to get into compliance. AR at 472. Thomas did not contact his attorney or write Trice a letter about the container. Trice is "Caucasian." AR at 404.

In May 2019, Thomas learned about an archery structure on the Hinkles' property. Thomas learned about the structure during a deposition when counsel brought it to his attention. The Hinkles' property is next door to the Harmons' property. The structure is in the corner of the Hinkles' property but is visible from the road. After learning about the structure, Thomas spoke to the Hinkles about either bringing the structure into compliance with the CC&Rs or removing it from the property. Thomas spoke with the Hinkles twice and did not send them a compliance letter. At the time of the hearing in July 2019, the Hinkles had not removed the structure from their property. Thomas intended to speak with his attorney after the hearing if the Hinkles' structure persisted.

In an attempt to address the temporary structure allegation raised in the compliance letters, the Harmons removed everything they thought "could be accused of being temporary structures," including: a dog house, cattle panel, a little shed, and a greenhouse. AR at 89. The Harmons admit to having placed a "drop box" for storage on their property during construction. AR at 81. The Harmons sold the drop box in response to the compliance letters. AR at 81.

Thomas' realtor, June Jones, photographed the Harmons' property. Jones explained that the photographs of the Harmons' property were taken at the instruction of Thomas' attorney and were for the purpose of identifying temporary structures and CC&R violations. Thomas'

11

attorney instructed that photographs be taken of two other neighbors' properties. Similarly, the Harmons took photographs of the Armstrongs', Hadlers', and Duvalls' properties. The Harmons explained that they took the photographs because they "were being sued for temporary structures, when clearly the neighbors had temporary structures." AR at 156.

2. *Motorhomes and Recreational Vehicles*

Thomas identified the Armstrongs as being the only other Trust-land purchasers who lived in their trailer longer than six months. When Thomas spoke to Armstrong about being out of compliance, Armstrong explained that "they'd get it taken care of." AR at 404. The Armstrongs' home was completed several weeks later and they removed the trailer from their property. The Armstrongs were out of compliance for approximately three weeks. Thomas did not write the Armstrongs a letter about living in the trailer within the first month of moving onto the property. Thomas explained that he did not write a letter because the Armstrongs were "actively constructing" their home. AR at 405. Armstrong is "Caucasian." AR at 405.

The Harmons admit that they lived in their trailer for longer than six months. The Harmons took possession of the property prior to the September 30, 2014 closing. Harmon testified that they might have had their trailer on the property as early as September 25. The Harmons received a temporary occupancy permit on September 29, 2015 and testified that they moved into their home after receiving the permit. 3. *Work Vehicles and Home Businesses*

The Harmons own a pressure washing business that they characterize as "a mobile business." AR at 69. For their business, the Harmons utilize a truck, van, and small trailer. The Harmons pressure wash houses, driveways, and parking lots. The Harmons do not do any pressure washing work on their property nor do they operate any of their equipment on their

property. The Harmons do not receive frequent deliveries of supplies and work-related materials to their property. The Harmons kept their pressure washer and related equipment on their property during construction. The Harmons also kept water and gasoline tanks attached to their work trailer.

The Harmons' neighbors, Preston and Blatnik, drive work vehicles to and from their properties. The Blatnik's vehicle is designed to run on the highway and on railroad tracks. Accordingly, the vehicle has iron wheels that drop down allowing it to transition from the highway to the railroad tracks. The Blatnik's vehicle has a work logo.

Thomas explained that he distinguishes the Harmons from Preston and Blatnik because the Harmons drag a trailer that "appears to have mixed chemical[s] in it" and because the Harmons' store their equipment in the open. AR at 479. Thomas alleges that the Harmons' equipment is visible from other lots.

B.      *Disparaging Statements*

Much of the basis for the remaining contentions come from three witnesses, Jamie Schmitz, Eric Lingo, and Erin Castellano. The ALJ disregarded their testimony based on credibility determinations. In March 2014, Eric Lingo and his wife, Jamie Schmitz, expressed interest in purchasing property from Thomas. Erin Castellano, Lingo's friend from work, toured the property with Schmitz, Lingo, and Thomas. Lingo and Schmitz entered into a verbal agreement to purchase property from Thomas and signed purchase agreements two years later.

Prior to purchasing the property, Lingo and Schmitz worked on clearing brush off the property. Schmitz alleged that she worked with Thomas on the property numerous times and

13

that she was not paid for her work. Instead Schmitz hoped that in exchange, Thomas would help them in the future should they need something done on their property.

In 2016, Lingo and Schmitz's purchase fell through because of a lack of financing. Schmitz's brother, Pat Fahey, along with Lingo spoke with Thomas' real estate agent, Mary Meeker, about the failed sale. The conversation became heated. Fahey cursed at Meeker and before leaving Meeker's office said "You haven't heard the last of me." AR at 737.

Shortly thereafter, Lingo and Schmitz learned that Thomas had brought an enforcement action against the Harmons. In April 2016, Lingo told the Harmons that Thomas had made disparaging remarks about the Harmons. The Harmons had not met Lingo and Schmitz previously. Instead, Lingo and Schmitz "just showed up on the [Harmons'] property" and told the Harmons the things that they had heard from Thomas. AR at 216. Lingo and Schmitz explained that Thomas said the Harmons "should worry about what [Thomas was] going to do next and that he was going to do whatever it took to get [the Harmons] off" the property. AR at 216. Lingo and Schmitz told the Harmons that Thomas said "he never should have sold to [the Harmons] and he won't make that mistake again." AR at 102. Lingo and Schmitz further alleged that Thomas had "used the N word [when speaking of Harmon] and [that] when speaking of [Harmon's son] called him a half-breed." AR at 103.

After speaking with Lingo and Schmitz, the Harmons filed for an anti-harassment protection order. The Harmons alleged that Thomas stalked their property and that he repeatedly drove by and stared at their home. Chaney-Harmon believed they filed a police report at some point, but was not sure when.

14

Lingo, Schmitz, and Castellano testified that while they were touring property, Thomas made comments about not wanting to sell to "Mexicans or Blacks or Gays" and "especially [not to] Russians." AR at 293. Lingo testified that when he repeated Thomas' comments to Meeker, she said that Thomas "'did say that but we can't allow him to do that because there are laws pertaining [to] protection.'" AR at 295. Meeker denied having discussed race with Lingo. AR at 738. Meeker further testified that she did not tell Lingo that Thomas "maintained a preference not to sell to Mexicans." AR at 738.

In addition to Lingo, Schmitz, and Castellano's testimony, Chaney-Harmon, Rebecca Hinkle, and Tyler Behrendsen provided testimony concerning Thomas' disparaging remarks. Chaney-Harmon testified that Thomas told Harmon and herself "that if [they] hired any Russians, . . . or Mexicans that he would throw [the Harmons] the hell out of there." AR at 201. The remarks were allegedly made while the Harmons were deciding which builders to use. Chaney-Harmon alleged that Thomas told them they could not hire Apostolic Lutheran builders. However, Thomas referred the Harmons to and the Harmons hired Apostolic Lutheran builders.

Rebecca Hinkle testified that while she was touring property for purchase, Thomas remarked that "he wasn't prone to Russians."[6] AR at 601. Thomas did not deny the credibility of Hinkle's testimony. AR at 922. Instead, Thomas acknowledged that "[i]f Ms. Hinkle said it, knowing Ms. Hinkle, [Thomas was] sure it probably was the truth." AR at 922.

---

[6] Although the transcript of the administrative hearing uses "prone to," HRC's briefing alleges that in the audio recording of the hearing, Hinkle used the phrase "fond of" when we recounting her conversation with Thomas. Br. of Resp't at 20.

Tyler Behrendsen worked with Thomas on developing the subdivision over the course of six years. Behrendsen never heard Thomas use racial slurs "directed towards any people," including the Harmons. AR at 862-63. Behrendsen clarified that although never directed towards a specific person, Thomas had used politically incorrect phrases in their line of work. Behrendsen explained that about the only time Thomas used a racial slur was in referring to a bowl of nuts as "n-word toes." AR at 864. Thomas admitted to having used the n-word within the past five years.

V. PROCEDURAL HISTORY

Following the administrative hearing, the ALJ concluded that Thomas had not violated WLAD and dismissed HRC's complaint. HRC sought judicial review in the superior court.[7] On appeal, the superior court set aside the ALJ's Final Order. The superior court held that the Final Order contained legal error, was not supported by substantial evidence, and was arbitrary and capricious. Thomas appeals to this court.

ANALYSIS

HRC argues that the Final Order is based on erroneous interpretations and application of the WLAD. HRC further argues that substantial evidence does not support the Final Order. Moreover, HRC argues that in disregarding or ignoring evidence, the Final Order's credibility findings are unsupported, arbitrary, and capricious. Accordingly, HRC asks this court to affirm

---

[7] Under this court's General Order 2010-1, "the party filing an appeal in superior court under [the] APA . . . shall have responsibility for the opening and reply briefs . . . and shall be entitled to open and conclude oral argument." Accordingly, HRC filed the opening and reply briefs and is entitled to open and conclude oral argument. Gen. Ords. of Div. II, 2010-1, In Re: Modified Proc. for Appeals Under the ADA, Ch. 34.05, and Appeals Under the LUPA, Ch. 36.70C RCW (Mar. 23, 2010) https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_ orddisp&ordnumber=2010-1&div=II.

the superior court's order setting aside the Final Order. We hold that the ALJ erred in its interpretation of WLAD and affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. STANDARD OF REVIEW

Under RCW 49.60.270, any party "aggrieved by a final order of an administrative law judge may obtain judicial review" of the order. In reviewing an administrative action, this court sits in the position of the trial court and applies the APA directly to the agency's administrative record. *Heinmiller v. Dep't of Health*, 127 Wn.2d 595, 601, 903 P.2d 433 (1995).

Under the APA, we will only grant relief from an agency's adjudicative order if it meets one of nine grounds. RCW 34.05.570(3); *Lewis Cnty. v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 157 Wn.2d 488, 498, 139 P.3d 1096 (2006). Here, HRC asserts three grounds for review under RCW 34.05.570(3):

> (d) The agency has erroneously interpreted or applied the law;
>
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;
>
> . . . .
>
> (i) The order is arbitrary or capricious.

RCW 34.05.570(3). The "burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a).

## II. RES JUDICATA

Preliminarily, Thomas and the Trust argue that the doctrine of res judicata bars HRC's complaint. Thomas and the Trust contend that: (1) the parties' stipulated order of dismissal in a

different proceeding functions as a final judgment, (2) the superior court action to enforce the CC&Rs against the Harmons involves the same subject matter as the activity that HRC now "complains of on the Harmons' behalf," (3) there is identity in the cause of action because HRC should have raised its WLAD claims in the prior proceeding, and (4) by bringing a complaint on the Harmons' behalf, HRC was in privity with the Harmons. Br. of Appellants at 30. Thomas and the Trust further argue that "HRC's prosecution of this action seeks to undo and impair the Trust's rights established in the superior court's summary judgment." Br. of Appellants at 32.

In its reply, HRC argues that Thomas and the Trust's invocation of res judicata "is procedurally barred and fails even if it is considered." Reply Br. of Resp't at 2. HRC argues that although Thomas and the Trust asserted res judicate in their answer, they "never filed a motion before the ALJ seeking judgment in their favor on this ground." Reply Br. of Resp't at 2. Furthermore, "the ALJ did not address res judicata in the Final Order." Reply Br. of Resp't at 2. HRC argues that because Thomas and the Trust did not "address res judicata in [their] briefing before the Superior Court," they waived the defense. Reply Br. of Resp't at 2. Should this court reach the merits of Thomas and the Trust's defense, HRC argues that it fails as a matter of law because there is a lack of identity of subject matter and parties. We agree that Thomas and the Trust's claim of res judicata fails.

Res Judicata, "a doctrine of claim preclusion," "bars relitigation of a claim that has been determined by a final judgment." *Williams v. Leone & Keeble, Inc.*, 171 Wn.2d 726, 730, 254 P.3d 818 (2011). Following a final judgment, res judicata applies to subsequent legal proceedings involving: "(1) the same subject matter, (2) the same cause of action, (3) the same persons or parties, and (4) the same quality of persons for or against whom the decision is made

as did a prior adjudication." *Id.* This court decides de novo whether res judicata applies. *Emeson v. Dep't of Corr.*, 194 Wn. App. 617, 626, 376 P.3d 430 (2016).

"A nonparty is in privity with a party if that party adequately represented the nonparty's interest in the prior proceeding." *Feature Realty, Inc. v. Kirkpatrick & Lockhart Preston Gates Ellis, LLP*, 161 Wn.2d 214, 224, 164 P.3d 500 (2007). Furthermore, privity "is established in cases where a person is in actual control of the litigation, or substantially participates in it even though not in actual control. Mere awareness of proceedings is not sufficient to place a person in privity with a party to the prior proceeding." *Loveridge v. Fred Meyer*, *Inc.*, 125 Wn.2d 759, 764, 887 P.2d 898 (1995).

Cases involving the same facts do not necessarily share the same subject matter. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 866, 93 P.3d 108 (2004).

WLAD charges HRC with the elimination and prevention of discrimination. RCW 49.60.010. Accordingly, statute provides HRC with certain powers and duties, including, the power to "receive, impartially investigate, and pass upon complaints alleging unfair practices." RCW 49.60.120(4). WLAD further provides that HRC may request "the appointment of an administrative law judge . . . to hear the complaint and shall cause to be issued and served in the name of the commission a written notice" with a copy of the complaint to the respondent. RCW 49.60.250(1). Subsequently, HRC's counsel presents the case in support of the complaint. RCW 49.60.250(2). However, "the complainant may retain independent counsel and submit testimony and be fully heard." RCW 49.60.250(2).

Here, because Thomas and the Trust invoked res judicata in their briefing before the ALJ, they may raise that argument before this court. Specifically, Thomas and the Trust invoked res

judicata in their answer and affirmative defenses, in their objections to witness testimony during the administrative hearing, and in their proposed findings of fact and conclusions of law. Accordingly, we will consider the merits of Thomas and the Trust's res judicata defense.

Thomas and the Trust fail to establish privity between HRC and the Harmons. In 2016, Thomas filed an injunction against the Harmons. Independent counsel, not HRC, represented the Harmons. The record does not suggest that HRC controlled or substantially participated in the 2016 litigation. Instead, HRC initiated this action after having received a complaint of racial discrimination and after conducting an independent investigation of the Harmons' allegations. Additionally, at the start of the adjudicative hearing, the ALJ specifically recognized that "although they are essential to the complaint, the Harmons today are not parties." AR at 6.

Furthermore, in defending against the 2016 litigation, the Harmons did not adequately represent HRC's broader interest in preventing discriminatory conduct. Statute empowers HRC to eliminate and prevent discrimination. Although, HRC seeks compensatory relief on behalf of the Harmons, HRC also seeks "a civil penalty and injunctive relief prohibiting [Thomas and the Trust] from engaging in further discriminatory conduct." CP at 4. HRC's requested remedies make clear that while HRC seeks to secure relief for the Harmons, HRC has an independent purpose in pursuing its complaint against Thomas and the Trust: the cessation of discriminatory conduct.

Moreover, Thomas and the Trust also fail to establish identity of subject matter between the 2016 litigation and the current action. There is overlap in the facts supporting both cases, however, this does not necessarily indicate identity of subject matter. In the 2016 litigation, Thomas sought an injunction to enforce the CC&Rs against the Harmons. Although the

Harmons initially brought six counterclaims, none of the claims involved discrimination or WLAD.

Accordingly, we hold that because Thomas and the Trust fail to establish identity of parties and subject matter, res judicata does not bar HRC's complaint.

### III.  RCW 34.05.570(3)(E) – SUBSTANTIAL EVIDENCE AND CHALLENGED FINDINGS

HRC identifies three assignments of error and cites a number of findings[8] in the Final Order associated with those assignments of error.

Under RAP 10.3(a)(4), a party's brief should contain a "separate concise statement of each error a party contends was made by the trial court."  Each challenged finding of fact requires a "a separate assignment of error."  RAP 10.3(g).  This court "will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto."  RAP 10.3(g).  "Without argument or authority to support it, an assignment of error is waived."  *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).

Under RCW 34.05.570(3)(e), this court "shall grant relief from an agency order in an adjudicative proceeding only if it determines that . . . [t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court."  Substantial evidence exists where the evidence is sufficient to persuade a fair-minded person of the truth or

---

[8] In its first assignment of error, HRC argues that the Final Order is based on the erroneous interpretation and application of WLAD and challenges the following conclusions of law: 5.11–19, 5.21, 6.1–6.3.  In its second assignment of error, HRC argues that the Final Order is not supported by substantial evidence and challenges the following findings of fact and conclusions of law: 4.11; 4.20–4.25; 4.30–4.32; 4.37; 4.39; 4.40–4.138; 5.11–5.19; 5.21, and 6.1–6.3.  In its third assignment of error, HRC argues that the Final Order is arbitrary and capricious and challenges the following findings of fact and conclusions of law:  4.11; 4.20–4.25; 4.30–4.32; 4.39; 4.40–4.99; 4.100–4.138; 5.11–5.19; 5.21, and 6.1–6.3.

correctness of the matter. *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000).

"The substantial evidence standard, like the arbitrary and capricious standard, is 'highly deferential' to the agency fact finder." *Alpha Kappa Lambda Fraternity v. Wash. State Univ.*, 152 Wn. App. 401, 418, 216 P.3d 451 (2009). The evidence "will be viewed in the light most favorable to . . . the party who prevailed in the highest administrative forum that exercised fact-finding authority." *Id.*

Here, HRC assigns error in a sweeping manner arguing that substantial evidence does not support the Final Order's findings of fact. The administrative record is more than 2,000 pages and the Final Order includes 138 findings of fact and 21 conclusions of law. In its three assignments of error, HRC cites to over 100 findings of fact and numerous conclusions of law. Many of the findings initially cited to in HRC's assignments of error are never discussed in the argument section of its brief.[9] Furthermore, many of the findings that are cited in HRC's assignments of error lack meaningful argument about why the record does not support those findings.[10]

After careful review of HRC's briefing and the record, we limit our review to only those findings that received meaningful argument. Accordingly, we review findings 4.55, 4.80, 4.110,

---

[9] HRC initially cites to findings, 4.204.25, 4.30–4.32, 4.37, 4.39–4.44, 4.51–4.53, 4.56–4.57, 4.59–4.79, 4.81–4.99, however, HRC never discusses these findings in the argument section of its brief.

[10] Although HRC cites to findings 4.45–4.50, 4.54, 4.100–4.109, 4.111–4.116, 4.118–4.135, 4.137–4.138, HRC does not provide meaningful argument explaining why the record does not support these findings.

4.115, 4.117, and 4.136 and conclude that substantial evidence supports these challenged

findings of fact. We further review finding 4.58 and conclude that substantial evidence does not

support finding 4.58. We decline to consider challenges to findings 4.45-4.50, 4.54, 4.100-

4.109, 4.111–4.116, 4.118–4.135, 4.137–4.138 because HRC presents no meaningful argument

regarding these findings.

A.      *Finding of Fact 4.55*

Finding of Fact 4.55 states,

> The Harmons began living on the property in their RV prior to the September 30, 2014 closing. They lived in the RV more than one year after that, even though the CC&Rs provide a six-month limit.

AR at 2487. HRC argues that finding 4.55 is inaccurate because the "Harmons had a temporary

residence permit and had moved into their home as of September 29, 2015." Br. of Resp't at 33

n.7.

The Harmons testified that they took possession of the property prior to the September

30, 2014 closing. Jones confirmed that the Harmons took early possession of the property.

Furthermore, Harmon testified that they might have had their trailer on the property as early as

September 25, 2014. The Harmons received a temporary residence permit on September 29,

2015 and testified that they moved into their home after receiving the permit.

Accordingly, the record contains substantial evidence supporting the finding that the

Harmons lived in their trailer for more than one year after taking early possession of the

property. Thus, we reject HRC's challenge to finding 4.55.

B.      *Finding of Fact 4.58*

Finding of Fact 4.58 states,

> During that year following the October 27, 2014 letter, Mr. Thomas talked to the Harmons about CC&R compliance. He spoke to them about the business equipment on the property, he spoke to them about their non-complying pole barn construction, and he talked about the various animal shelters and a storage container.

AR at 2487. HRC argues that this finding is unsupported by the record and that "Thomas' testimony undercuts" this finding. Br. of Resp't at 53.

The record contains conflicting evidence on whether Thomas spoke to the Harmons about their pole barn construction, animal shelters, and storage container during the year following the October 27, 2014 letter. The Harmons both testified that Thomas did not speak to them about CC&R violations. Specifically, the Harmons testified that Thomas had been to their property numerous times but that he "never" discussed CC&R violations. AR at 76. Harmon explained that the first time the Harmons heard about the CC&R violations after the October 27, 2014 letter was in "a letter from Mr. Thomas' lawyer." AR at 75. Harmon further testified that Thomas "never [orally] mentioned the CC&R violations." AR at 76. Chaney-Harmon testified that Thomas did not speak with the Harmons regarding the issues raised in the December 18 letter. Chaney-Harmon confirmed that Thomas had "been to [the Harmons'] property multiple times," but that "the only thing he commented on was were [the Harmons] chicken farmers now." AR at 215. Also notable is that in Thomas' attorney's letter dated October 7, 2015, the attorney referenced only "written" and "correspondence" in relation to Thomas' prior contacts regarding covenant violations. AR at 1462.

Conversely, Thomas' testimony varied regarding whether he discussed CC&R violations with the Harmons. On the first day that Thomas testified, he explained that he identified "several" temporary structures on the Harmons' property, specifically "some kind of

24

containment with tarps." AR at 390. Thomas explained that he thought "somebody" spoke to the Harmons about removing the structures but stated "I don't know if it was me." AR at 390. Thomas repeated his uncertainty, explaining that he may or may not have spoken with the Harmons about their temporary structures but that he could not confirm without speculating. AR at 394-95. In regards to the Harmons' pole barn, Thomas testified that the Harmons "knew . . . from day one, it didn't match the house" and wondered why he would "have [] to tell somebody something they already know." AR at 409. Thomas further explained that he filed the enforcement action because the Harmons "wouldn't abide by the CC&Rs and we weren't getting anywhere talking to them." AR at 476. When asked whether Thomas made verbal demands regarding any of the alleged CC&R violations, Thomas replied, "I'm sure we did, yes." AR at 511. Thomas did explain that he was not sure when or in what conversation he spoke with the Harmons but that "from day one we were concerned that we had a problem, we talked about the problem with them." AR at 511.

During Thomas' continued testimony the next day, Thomas described having spoken with the Harmons a "[m]any number of times" about coming into compliance with the CC&Rs, specifically about the pole barn. AR at 912. The marked change in Thomas' certainty concerning his conversations with the Harmons prompted HRC to inquire whether Thomas had "talked to [his] attorney from yesterday to today." AR at 914. Thomas explained that he had not spoken with his attorney and instead suggested that his inconsistent testimony was the result of having "talked to [the Harmons about] a lot of different things," such that he could not recall the specifics. AR at 916.

25

Although heavily disputed, the record provides substantial evidence that the Harmons were certain Thomas did not speak with them concerning those specific CC&R violations. By comparison, Thomas could not identify when or if he spoke with the Harmons or the content of those conversations. Thomas' use of "we" suggests that Thomas spoke with other individuals about the Harmons' violations and that other individuals, such as his attorney and realtor, may have spoken with the Harmons.

In light of the entire record, the evidence suggests that Thomas spoke to the Harmons about CC&R compliance generally. However, the record does not provide sufficient evidence to persuade a fair-minded person that Thomas spoke to the Harmons specifically about their business equipment, animal shelter, and storage container after sending the October 27 letter. Accordingly, this finding is not supported by substantial evidence.

C.    *Finding of Fact 4.80*

Finding 4.80 states,

On December 31, 2015, Ms. Chaney-Harmon responded to Mr. Thomas's attorney alleging she never received any prior communications. Rather than acknowledging non-compliance and discussing compliance, Ms. Chaney-Harmon disputed she was in violation of the CC&Rs. She requested clarification and removed a storage container (temporary structure).

AR at 2490. HRC argues that the finding mischaracterizes Chaney-Harmon's response, Chaney-Harmon did not dispute non-compliance, and instead requested clarification about non-conforming temporary structures.

Chaney-Harmon's letter dated December 31, 2015, states:

"Earl Jackson,

I have not received any written communications, or any communications, from B. Thomas Jr. (Tom), regarding any potential ccr violations prior to an

26

attorney's letter, as you have stated. We have complied by removing our storage container that he said we could have during construction which is still occurring, and legally permitted, contrary to your/his accusations. RV's are allowed, and we are not, and have not, been using it for 'limited family use for periods not to exceed 10 days'. You need to clarify these said temporary structures in question. We did not dig a 3 ft. deep ditch around our property line, as you are accusing, merely removed sod. Nothing on our property is interfering or diverting drainage with pre-existing drainage done by Tom. There are NO trailers bearing signs or logos of a business. There is no on-site storage, or display of materials or inventory outside or visible from any lot. Our personal vehicles that bear a sign or logo of a business will not be visible from any lot."

AR at 1824.

Chaney-Harmon's December 31 letter does not acknowledge non-compliance. Chaney-Harmon uses the word "complied" in regard to removing a storage container, but states that they had permission to have it and it was properly permitted. This constitutes a denial of non-compliance with the CC&R.

In light of Chaney-Harmon's denial of the alleged violations, substantial evidence supports the finding.

D.      *Finding of Fact 4.110*

Finding 4.110 states,

In enforcing the CC&Rs, Mr. Thomas provided time for compliance to others, as he did for the Harmons. So far, all property owners but the Harmons complied without legal action. None continued in non-compliance for a year after notice of non-compliance. Mr. Thomas enforced CC&R restrictions on all properties sold by the Trust whenever he knew of violations and if he had authority to do so.

AR at 2493. HRC challenges this finding as being factually inaccurate and argues that the "ALJ does not identify any CCR provision that the Harmons violated for a year after receiving notice."

Br. of Resp't at 33 n. 7.

27

As an initial matter, HRC mischaracterizes the finding as having stated that "the Harmons were in 'non-compliance for a year after notice of non-compliance.'" Br. of Resp't at 33 n.7. The finding refers to none of the Harmons' neighbors being "in non-compliance for a year after notice of non-compliance." AR at 2493.

Substantial evidence supports the finding that none of the Harmons' neighbors continued in non-compliance for a year after notice of non-compliance. Trice and the Armstrongs brought their properties into compliance within months after notice of non-compliance. By comparison, the Harmons lived in their trailer for more than a year while their home was under construction. Furthermore, Thomas testified that despite the Harmons having received notice in October 2015 concerning their temporary structures, the Harmons were "probably" still in violation of the CC&Rs at the time of the hearing. AR at 462. Thomas further explained that it was his "best guess" that the Harmons placed temporary structures on their property "at least a year" prior to the January 2016 photographs capturing the structures on the Harmons' property. AR at 911. Thomas' testimony supports the finding that the Harmons were non-compliant with the CC&Rs for a year after receiving notice about their temporary structures.

Accordingly, substantial evidence supports finding 4.110.

E.      *Findings of Fact 4.115 and 4.136*

Finding 4.115 states,

> Testimony that Mr. Thomas disparaged and targeted the Harmons based on race is largely provided by Jamie Lynn Schmitz, Eric Lingo and Erin Castellano. The testimony of these three witnesses and the facts in their declarations are rejected.

AR at 2494. Relatedly, finding 4.136 states,

> The testimony of Ms. Schmitz, Ms. Castellano, and Mr. Lingo is inconsistent with logic and the undisputed facts in this case. Their testimony is not credible. Their

28

> allegations of racial disparagement, discrimination in real estate transactions and Mr. Thomas' intent to push the Harmons out are inconsistent with the preponderance of credible testimony. The testimony that Mr. Thomas expressed an intent to discriminate against the Harmons and created a hostile environment is rejected.

AR at 2496-97. HRC argues that the ALJ's credibility and factual findings are unsupported and "have the effect of disregarding *any* witness testimony and evidence that is favorable to HRC and the Harmons without adequate justification." Br. of Resp't at 46-47.

We do not reevaluate a fact-finders' credibility determinations. *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 588, 90 P.3d 659 (2004); *Thomas v. Dep't of Emp't Sec.*, 176 Wn. App. 809, 813, 309 P.3d 761 (2013). Instead, we "accept the fact finder's determinations of witness credibility and the weight to be given reasonable but competing inferences." *Alpha Kappa Lambda*, 152 Wn. App. at 418. Furthermore, "just as we do not weigh credibility, we do not substitute our judgment for that of the agency." *Id.*

HRC's challenge to the ALJ's credibility determinations fails because evaluating credibility determinations made by the administrative body is inconsistent with controlling caselaw to the contrary.

F.      *Finding of Fact 4.117*

Finding 4.117 states,

> Ms. Schmitz and Mr. Thomas became close. She worked on the land she wanted to purchase, and helped clear it. Mr. Lingo worked on the property, too. Ms. Schmitz sometimes rode around with Mr. Thomas as he worked on the land. She claimed she is uncompensated for hundreds of hours of work over a period of two years.

AR at 2494. The HRC argues that this finding is unsupported by the record and that "Schmitz never claimed she was supposed to be paid for the work helping out on the land." Br. of Resp't at 52.

Although Schmitz did not use the term "compensated," substantial evidence supports her claim of being unpaid for her work on Thomas' property. Schmitz testified she worked with Thomas, not for him, and was never paid for her services. The ALJ asked Schmitz whether she had asked Thomas to pay her for her work on the property. Schmitz answered "I wasn't paid for the work I was doing." AR at 341. Schmitz explained that she "wanted it [to] go toward the property, if we did anything, that [Thomas] would help us in the future to—if we needed something done on the property." AR at 341. Schmitz further explained that "no money . . . ever exchanged hands." AR at 342. When asked how many hours she had worked on Thomas' property, Schmitz replied "hundreds." AR at 342.

Accordingly, substantial evidence supports the ALJ's finding that Schmitz claimed that she was uncompensated for hundreds of hours of work.

IV. RCW 34.05.570(3)(D) - ERRONEOUS INTERPRETATION AND APPLICATION OF LAW

HRC argues that the Final Order erroneously interpreted and applied three provisions of the WLAD—RCW 49.60.222(1)(g), RCW 49.60.222(1)(b), and RCW 49.60.2235.

Under RCW 34.05.570(3)(d), this court "shall grant relief from an agency order in an adjudicative proceeding only if it determines that . . . [t]he agency has erroneously interpreted or applied the law." We review de novo issues of law under RCW 34.05.570(3)(d) and "accord deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues." *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998).

A.       *RCW 49.60.222(1)(g) – Statements in a Real Estate Transaction*

HRC argues that the Final Order "misinterpreted RCW 49.60.222(1)(g) and applied an incorrect legal standard when it rejected HRC's claim on the basis that a '[s]tatement of caution or distrust of a certain ethnic group is not equivalent with a statement of intent to discriminate against that class of individuals in a real estate transaction.'" Br. of Resp't at 17-18. HRC contends that "[a]ny ordinary listener would understand that statements about harboring negative views of Russians while showing property and discussing a desire to meet prospective purchasers suggests an intent to make a prohibited limitation with respect to selling to individuals who are Russian, that is, based on national origin and ethnicity." Br. of Resp't at 20.

Conclusion of Law 5.11 states:

HRC failed to establish by a preponderance of the evidence that Respondents made discriminatory statements in connection with prospective real estate transactions indicating an intent to limit, specify or discriminate against certain protected classes. The allegations of such discriminatory statements by the Harmons, Mr. Lingo, Ms. Schmitz and Ms. Castellano are not credible. The testimony of June Jones, Mary Meeker, Benjamin Thomas, Natalie Morris, Jenni Stanton-Johnson and Tyler Behrendsen on this issue is credible. *Respondents did not violate RCW 49.60.222(1)(g) in the subject real estate transaction with Lana Chaney-Harmon. Statement of caution or distrust of a certain ethnic group is not equivalent with a statement of intent to discriminate against that class of individuals in a real estate transaction in violation of the WLAD. Respondents did not violate RCW 49.60.222(1)(g) in statements made to Rebecca Hinkle, nor is any such violation alleged in the HRC Complaint. No evidence establishes the Harmons are aggrieved by any such statement.*

AR at 2499 (emphasis added).

Under WLAD,

It is an unfair practice for any person, whether acting for himself, herself, or another, because of sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, families with children status, honorably discharged veteran or military status, the presence of any sensory, mental, or physical disability, or the use of a trained dog guide or service animal by a person with a disability:
. . . .

> (g) To make, print, circulate, post, or mail, or cause to be so made or published a statement, advertisement, or sign, or to use a form of application for a real estate transaction, or to make a record or inquiry in connection with a prospective real estate transaction, which indicates, directly or indirectly, an intent to make a limitation, specification, or discrimination with respect thereto.

RCW 49.60.222(1)(g).

There are very few Washington cases that address RCW 49.60.222(1)(g). However, there is federal authority that interprets a similar provision under the Fair Housing Act (FHA). The analogous provision of the FHA states:

> As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

> (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

When construing WLAD, Washington courts may look to federal caselaw interpreting analogous federal law.[11] *Tafoya v. State Human Rights Comm'n*, 177 Wn. App. 216, 224, 311 P.3d 70 (2013). In the absence of Washington case law analyzing RCW 49.60.222(1)(g), federal authority may prove instructive.

---

[11] For example, in *Tafoya*, this court sought guidance from federal case law analyzing an analogous FHA provision when there "[were] no Washington cases that address[ed] sexual harassment as an unfair practice in real estate transactions under the WLAD." 177 Wn. App. at 224. Accordingly, this court explicitly provided that it "may look to the federal case law when a federal antidiscrimination law contains the same protections and mandates the same broad construction." *Id.*

Cases analyzing 42 U.S.C. § 3604(c) focus mainly on "allegations of 'steering' protected individuals away from certain housing opportunities and/or obviously discriminatory statements made to prospective renters." *Pack v. Fort Washington II*, 689 F. Supp. 2d 1237, 1245 (E.D. Cal. 2009). These cases make clear that 42 U.S.C. § 3604(c) does not require a showing of discriminatory intent. *Id.* Instead, discriminatory preference "is the basis for a § 3604(c) violation." *Id.*

To bring a claim under § 3604(c), "a plaintiff need not have been the direct victim of the discriminatory statements perpetuated by [the] defendant[]." *Housing Rights Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1193 (C.D. Cal. 2004); [12] *Harris v. Itzhaki*, 183 F.3d 1043, 1052 (9th Cir. 1999). Instead, the proper inquiry is whether a statement suggests a discriminatory *preference* to an ordinary listener. *Pack*, 689 F.Supp.2d at 1245.

Here, the ALJ erred in interpreting and applying RCW 49.60.222(1)(g). The Final Order concluded that "[a] statement of caution or distrust of a certain ethnic group is not equivalent with a statement of intent to discriminate against that class of individuals." AR 2499. On its face, RCW 49.60.222(1)(g) does not require a direct statement of intent to discriminate. Instead, a statement that "indirectly" indicates an intent to discriminate is sufficient to violate RCW 49.60.222(1)(g).

Next, Hinkle testified that she discussed race with Thomas while touring property for purchase. Hinkle explained that Thomas "was talking about wanting to see the families that he

---

[12] In *Sterling*, the court held that an African American tenant's inability to read Korean notices distributed by the apartment's management was irrelevant to his § 3604(c) claim. 404 F. Supp. 2d at 1193-94. Instead the court explained that § 3604(c) "requires only that the notices or statements in question suggest a preference for a particular group to an 'ordinary reader'—not that they suggest a preference to a tenant or even to the plaintiff." *Id.*

was selling property to" and that Thomas "said that he wasn't prone to Russians." AR at 616. Hinkle did not share information about Thomas' statement with the Harmons, Schmitz, or Lingo. Thomas did not dispute Hinkle's testimony. Instead, Thomas acknowledged and further supported Hinkle's testimony. Thomas agreed that if Hinkle "said it, knowing Ms. Hinkle, I'm sure it probably was the truth." AR at 922. Thomas further explained that he is "a little more cautious around Russian people" and that because "they live in a different world than we are accustomed to," they make Thomas "a little gun shy." AR at 927. Thomas clarified that he is "very well-aware of the fact that you cannot let that get in the way of whether . . . [or] not you will sell to [Russians]." AR at 927.

In interpreting and applying RCW 49.60.222(1)(g), the ALJ is tasked with determining whether, within the context of a real estate transaction, Thomas' statement suggests to an ordinary listener a discriminatory preference against selling to Russians on the basis of national origin. Furthermore, although federal case law makes clear that a plaintiff need not have been the direct victim of the discriminatory statements, the ALJ must also determine whether Thomas' statement to Hinkle meets the requirements for an unfair practice under RCW 49.60.222(1)(g) in a case brought on behalf of the Harmons.

Because HRC has authority to bring a claim against an individual making a statement in connection with a prospective real estate transaction, which indicates an intent to make a limitation, specification, or discrimination with respect thereto because of a protected class listed in RCW 49.60.222(1)(g); and because HRC is not limited to bringing claims related to statements made to just the Harmons' in their real estate transaction, then evidence establishing that the Harmons were "aggrieved" by Thomas' statements is not required for a violation of this

34

provision of the WLAD. RCW 49.60.222(1)(g). Whether the HRC can collect any fine or whether the Harmons are entitled to damages for this particular unfair practice has not been determined and is to be determined by the ALJ.

Accordingly, the ALJ erred in interpreting and applying RCW 49.60.222(1)(g).

B.  *RCW 49.60.222(1)(b) – Discrimination*

HRC argues that the "Final Order erred in interpreting and applying RCW 49.60.222(1)(b)." Br. of Resp't at 24. HRC argues that the Final Order "erred in concluding that Appellants did not discriminate against or harass the Harmons by selectively and more harshly enforcing the CCRs against [the Harmons]." Br. of Resp't at 24. HRC further contends that race was a substantial motivating factor in the Harmons' treatment.

Under RCW 49.60.222(1)(b), it is an unfair practice to "discriminate against a person [on the basis of race or color] in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith." Federal case law analyzing the analogous FHA provision[13] explains that "a plaintiff must show that he or she was subjected to different 'terms, conditions, or privileges because of a protected status.'" *Sterling*, 404 F. Supp. 2d at 1192. A triable issue exists where a plaintiff can "provide proof that he or she suffered 'disparate treatment' in that 'defendant intentionally discriminated against plaintiff.'" *Id.*

Unlawful discrimination may be evidenced by "deviat[ion] from historical housing practices." *Id.* at 1193 (finding that a triable issue under § 3604(b) exists where apartment owners demonstrate preference for Korean tenants and deviated "from historical housing

---

[13] Under 42 U.S.C. § 3604(b), it is unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

practices with respect to the acceptance of rent checks and pursuit of back rent"). Comparator evidence demonstrating differential treatment "is relevant and admissible but not required." *Johnson v. Chevron U.S.A., Inc.*, 159 Wn. App. 18, 33, 244 P.3d 438 (2010) (holding that jury instructions requiring appellant to show different treatment on basis of race or disability was error).

Here, HRC's argument implicates the Final Order's conclusion 5.15 that Thomas and the Trust "did not violate RCW 49.60.222(1)(b) by unlawfully harassing the Harmons and/or creating a hostile environment based on race or ethnicity." AR at 2500. In reaching its conclusion, the Final Order relies, in part, on finding 4.58 that Thomas spoke to the Harmons about CC&R compliance. As discussed above, finding 4.58 is not supported by substantial evidence.

However, even without finding 4.58, the remaining findings do not support HRC's argument that the CC&Rs were selectively and more harshly enforced against the Harmons on the basis of race. The findings are clear that Thomas required compliance with the CC&Rs from the Harmons and their neighbors. Thomas allowed both the Armstrongs and the Harmons to live in their motorhomes beyond six months before requiring compliance. Thomas required Trice to remove the storage container from his property, just as he required the Harmons to remove their drop box. After learning about the Hinkle's archery structure, Thomas "contacted them about it." AR at 2493. Similarly, Thomas required the Harmons to remove temporary structures from their property. In each instance, after a period of non-compliance, Thomas required compliance with the CC&Rs thus supporting the conclusion that Thomas equally enforced the CC&Rs.

Furthermore, the remaining findings do not support HRC's argument that Thomas' CC&R enforcement against the Harmons was motivated by race. HRC relies on testimony from Schmitz and Lingo to demonstrate Thomas' racial animus towards the Harmons. However, as discussed above, the ALJ made unreviewable credibility determinations, rejecting Schmitz and Lingo's testimony.

Accordingly, we hold that the Final Order did not err in interpreting and applying RCW 49.60.222(1)(b).

C.      *RCW 49.60.2235 – Harassment*

In its amended complaint before the ALJ, HRC brought one cause of action under RCW 49.60.2235. HRC alleged that Thomas had "intimidated, threatened, and/or interfered with the Harmons' exercise or enjoyment of rights regarding real estate transactions." AR at 1134. On appeal, HRC provides little analysis concerning RCW 49.60.2235. It appears that HRC relies on the enforcement letters, photographing and monitoring of the Harmons' property, Lingo and Schmitz's testimony, and the Harmons' anti-harassment protection order as evidence of intimidation, interference, or threatening behavior towards the Harmons in violation of RCW 49.60.2235. Br. of Resp't at 41-42.

Under RCW 49.60.2235, it is unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . rights regarding real estate transactions secured by . . . RCW 49.60.222" and by other provisions of WLAD. Under RCW 49.60.222(1)(b), it is an unfair practice to "discriminate against a person [on the basis of race or color] in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith." Although RCW 49.60.2235 invokes the rights protected by RCW

49.60.222(1)(b), these statutory provisions provide for two separate causes of action. As such, a finding of discrimination under RCW 49.60.222(1)(b) does not entitle a party to a finding of harassment or interference under RCW 49.60.2235.

Here, the Final Order's findings support the conclusion that Thomas did not violate RCW 49.60.2235. First, HRC argues that the Harmons' property was monitored; however, the findings explain that Thomas' "business for the Trust routinely placed him in the immediate vicinity and on the road in front of the Harmons' home daily" and that "[t]his caused no problem for the Harmons until Mr. Thomas began CC&R enforcement in October 2015." CP at 18.

Next, while the Harmons' anti-harassment protection order allows for the inference of intimidation, the findings explain that the Harmons "only thought contact with Mr. Thomas harassing and frightening in light of what Ms. Schmitz and Mr. Lingo told them." CP at 20. Prior to the visit from Schmitz and Lingo, "the Harmons were not frightened by Mr. Thomas or his behavior and did not think enforcement of the CC&Rs racially motivated." CP 20. The Final Order's findings suggest that the Harmons secured the anti-harassment protection order in response to Schmitz and Lingo's allegations.

Furthermore, the findings illustrate a tense relationship between the Harmons and their neighbors. The findings explain that "[t]ension arose between neighbors and the Harmons because of the condition of the Harmon property, the Harmon's dogs and behaviors complained of by the neighbors and the Harmons against each other." CP at 17. HRC argues that the Harmons' property was photographed, however, the findings explain that the Harmons also "took photographs of their neighbors' properties to document non-compliance," prompting neighbors to complain of trespassing. CP at 22. As a result of the tense relationship between the

38

Harmons and their neighbors, the Harmons' neighbors told "June Jones they would sue Mr.

Thomas to force [CC&R] enforcement" against the Harmons. CP at 16. Leading up to CC&R

enforcement, Thomas and the Harmons enjoyed a "cordial relationship." CP at 14. However,

this relationship "became tense as [the Harmons'] relationship with their neighbors deteriorated

independent of" Thomas. CP at 20.

Accordingly, the Final Order's findings do not support that Thomas interfered with or

threatened the Harmons' enjoyment of rights secured by WLAD. Instead, the findings

demonstrate that Thomas and the Harmons enjoyed a cordial relationship that was complicated

by the Harmons' neighbors' demands for compliance, subsequent enforcement action, and

Schmitz and Lingo's allegations.

Thus, we hold that the Final Order did not err in interpreting and applying RCW

49.60.2235.

## V. RCW 34.05.570(3)(I) – ARBITRARY AND CAPRICIOUS

HRC argues that the "Final Order relies on numerous 'credibility' determinations that are

arbitrary, capricious, and unsupported by substantial evidence." Br. of Resp't at 45. HRC

contends that "rejecting testimony on 'credibility' grounds without adequately explaining one's

reasoning, and without consideration of [the] whole record, does not . . . insulate an

administrative order from judicial review." Br. of Resp't at 45-46. Specifically, HRC argues

that the "Final Order's findings disregard Ms. Castellano's testimony without offering any

substantive reason why her testimony is not credible." Br. of Resp't at 48. In regards to Lingo

and Schmitz, HRC argues that "[n]one of the grounds the Final Order used to disregard their

testimony were justified, adequately explained, or consistent with the record such that the findings survive scrutiny." Br. of Resp't at 49-50.

Under RCW 34.05.570(3)(i), "a court shall grant relief from an agency order in an adjudicative proceeding only if it determines that" the order "is arbitrary or capricious." An order is arbitrary or capricious where it is a "'willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action.'" *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38,46-47, 959 P.2d 1091 (1998). However, where "'there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.'" *Id.* at 47 (quoting *Kendall v. Douglas, Grant, Lincoln, & Okanogan Counties Pub. Hosp. Dist. No. 6*, 118 Wn.2d 1, 14, 820 P.2d 497 (1991)). Determinations concerning witness credibility "are for the trier of fact, not the appellate court." *Russell v. Dep't of Human Rights*, 70 Wn. App 408, 421, 854 P.2d 1087 (1993); *Karanjah v. Dep't of Soc. & Health Services*, 199 Wn. App. 903, 916, 401 P.3d 381 (2017).

Here, we decline to reevaluate the ALJ's credibility determinations for substantial evidence. Instead, our inquiry focuses on whether the Final Order's credibility determinations are a willful and unreasoning action. In its Final Order, the ALJ dedicates over 20 findings of fact to Lingo, Schmitz, and Castellano's involvement in this matter. The findings describe the witnesses' relationship to Thomas, their statements to the Harmons, and their allegations in comparison to other witnesses' testimony. By examining Lingo, Schmitz, and Castellano's testimony in several different contexts, the ALJ's findings demonstrate reasoned consideration of the challenged witnesses' testimony. Although this record provides room for competing

opinions, this court may not substitute its opinion for that of the ALJ where the findings demonstrate due consideration.

Accordingly, the Final Order's findings concerning HRC's witnesses are not arbitrary and capricious.

VI. EVIDENCE OF TREATMENT OF OTHER INDIVIDUALS: APPLICABILITY AND RELEVANCE IN DETERMINING DISCRIMINATION AS A MATTER OF LAW

HRC argues that the ALJ "committed legal error by absolving Thomas and the Trust of liability based on treatment of individuals other than the Harmons. Br. of Resp't at 42. HRC contends that "the Final Order legally erred in immunizing Appellants from liability, and discrediting all of HRC's witnesses, on the basis that Appellants may have sold to other mixed race couples, occasionally enforced the CCRs against white landowners, or referred individuals who bought land to 'diverse' service providers." Br. of Resp't at 44. Accordingly, HRC argues that "the appropriate legal inquiry is whether the Harmons' race was a substantial motivating factor in their treatment." Br. of Resp't at 44.

Civil rights laws would have little force if claims of discrimination could be defeated "by [a defendant] treating a single member of the protected class in accordance with the law." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Accordingly, "discrimination against one [person] cannot be cured, or disproven, solely by favorable, or equitable, treatment of other [people] of the same race or sex." *Brown v. Henderson*, 257 F.3d 246, 252 (2nd Cir. 2001).

Here, HRC is correct that the appropriate legal inquiry is whether the Harmons' race was a substantial motivating factor in their treatment. Rather than adopt HRC's arguments, the ALJ

determined that "the evidence supports the conclusion that Mr. Thomas' relationship with the Harmons . . . was driven by the parties' respective positions in the CC&R enforcement action, escalated by the provocative interposition of" Lingo and Schmitz. AR at 2338.

As the fact finder, the ALJ is authorized to weigh the evidence and determine issues of witness credibility. Determinations of witness credibility are fact intensive and highly nuanced. As discussed above, we do not disturb credibility determinations on review. *Port of Seattle.*, 151 Wn.2d at 588..

The record suggests that the ALJ used evidence of how Thomas treated other individuals, not to absolve Thomas and the Trust of liability, but to determine the credibility of HRC's witnesses. For example, in finding 4.114 the ALJ found that the testimony that "Thomas said he would not allow those of targeted ethnic and religious groups to buy or work on the property is belied by the undisputed fact that he did sell to those protected classes." AR at 2494. The ALJ further found that although Lingo, Castellano, and Schmitz said that "Thomas told them he would not sell to these protected classes, Mr. Thomas sold property to Apostolic Lutherans, Nathan Hallstrom, mixed race couples, the Harmons and the Blatniks, Hispanics, April Tovar-Villa and Rodrigo Osorio, and same-sex couple, Jenni Stanton-Johnson and Muriel Stanton." AR at 2496.

Contrary to HRC's argument, these findings suggest that the ALJ used the evidence of Thomas' treatment of other individuals to highlight inconsistencies in witness testimony and to subsequently discredit those witnesses. The ALJ did not use the instances of sales to protected classes to establish that Thomas did not commit unlawful actions in this instance, which would have been legal error.

42

Accordingly, the ALJ did not commit legal error in considering evidence of Thomas' treatment of other individuals when making witness credibility determinations.

CONCLUSION

We hold that res judicata does not bar HRC's claim because Thomas failed to establish identity of parties and subject matter. We hold that substantial evidence supports challenged findings of fact 4.55, 4.80, 4.110, 4.115, 4.117, and 4.136, but that substantial evidence does not support finding 4.58. We hold that the ALJ erred in their interpretation and application of RCW 49.60.222(1)(g) when the ALJ concluded that Thomas' statement of distrust concerning Russians was not sufficient to violate WLAD. We further hold that the ALJ did not err in interpreting RCW 49.60.222(1)(b) because the findings do not suggest that Thomas selectively or more harshly enforced the CC&Rs against the Harmons on the basis of race. Moreover, we hold that the ALJ did not err in interpreting RCW 49.60.2235 because the findings did not evidence coercion, intimidation, or threatening behavior. Additionally, we hold that although the record provides evidence to support competing inferences, the Final Order's findings concerning the credibility of HRC's witnesses are not arbitrary and capricious. Finally, we hold that the ALJ did not commit legal error in considering evidence of Thomas' treatment of other individuals when making credibility determinations.

Accordingly, we affirm the trial court's findings concerning the erroneous interpretation and application of RCW 49.60.222(1)(g), reverse the trial court on all other grounds, and remand this matter for further proceedings consistent with this opinion.

No. 57010-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Cruser, A.C.J.

Price, J.